Filed 7/9/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| NOEL BENDER, | B236294 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC 440862) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Richard L. Fruin, Jr., Judge. Affirmed.

Lawrence Beach Allen & Choi, David D. Lawrence and Jin S. Choi for Defendants and Appellants.

Law Offices of Goldberg & Gage, Bradley C. Gage, Terry M. Goldberg, Milad Sadr; Benedon & Serlin, Gerald M. Serlin and Douglas G. Benedon for Plaintiff and Respondent.

_____

**SUMMARY**

The Bane Act (Civ. Code, § 52.1) authorizes a civil action "against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law." (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 331 (*Jones*).) Plaintiff Noel Bender brought such a lawsuit based on his unlawful arrest and the beating administered by sheriff's deputies during that arrest, while he was in handcuffs and not resisting arrest. The jury found a Bane Act violation.

Defendants, the County of Los Angeles and Sheriff's Department Deputy Scott Sorrow, contend the Bane Act does not apply when a Fourth Amendment search and seizure violation is accompanied by the use of excessive force, because "coercion is inherent" in any unlawful seizure. In an excessive force case, they say, the Bane Act requires a showing that the "threats, intimidation, or coercion" caused a violation of a separate and distinct constitutional right in addition to the Fourth Amendment violation. We disagree.

Defendants also contend a new trial should have been granted based on errors in evidentiary rulings and excessive damages, and they challenge the amount of the attorney fee award, the award of expert witness fees under Code of Civil Procedure section 998, and the costs awarded for trial technology and presentation. We find no error and affirm the judgment.

**FACTS**

The evidence presented at trial established the following facts.

Plaintiff lived at and managed an apartment complex in Palmdale. Some tenants of the building believed the police were "harassing people" in the complex because a police officer had been shot there earlier in the year. The tenants were mostly African-American and Hispanic. Earlier on the day of the events in this case, Deputy Sorrow, according to one tenant, drove his patrol car to the complex, opened the door and yelled "[the N word]," and drove off when people started running.

2

On the evening of August 26, 2009, at about 10:30 p.m., plaintiff returned to the apartment complex after his college classes. He attended to a few matters in the complex, then went to his apartment. About 30 minutes later, he came out to turn off the water to the pool and to make sure the front gate was secured. He told a couple of children who were still playing outside with a basketball to go home. Then, Deputies Sorrow, Omar Chavez and Ray Hicks came in through the front gate.

The three deputies went up the stairs inside the gate. Deputies Chavez and Hicks came back down the stairs with two African-Americans in handcuffs, a man and a woman in their 20's. The man had been drinking alcohol and the woman had been smoking marijuana. While Deputies Hicks and Chavez were making the arrests, plaintiff heard a glass break. Deputy Sorrow was on the stairs and began picking up the broken glass. Plaintiff said, "Don't worry, I'll pick that up." Deputy Sorrow came down the stairs and approached plaintiff, saying, "you haven't been fired yet." Then, Deputy Sorrow accused plaintiff of "smoking with those people," and plaintiff replied he did not smoke marijuana and had not been smoking. (According to Deputy Sorrow, plaintiff asked why the deputies were harassing the tenants in his apartment complex.)

Deputy Sorrow asked plaintiff his name, and when plaintiff gave his name, Deputy Sorrow said, "Shut the [f---] up." Then, Deputy Sorrow again asked for plaintiff's name. Plaintiff repeated his name, and said he had been "trying to work with Deputy Phillips to clean up the building, and that if it would help [plaintiff] could give [Deputy Sorrow] [his] employer's name, too." (The apartment complex had been participating in a "Partners Against Crime" program and Deputy Phillips was assigned to the building as a part of that program.) Deputy Sorrow responded by saying Deputy Phillips had told him to arrest plaintiff. Plaintiff had never actually met Deputy Phillips, and was "shocked" to hear Deputy Phillips had said to arrest him. He asked Deputy Sorrow, in "a little bit nervous but a regular tone of voice," why, "and [Deputy Sorrow] said because I was protecting those – he said, you're protecting these [N word]."

Then, according to plaintiff and a number of other witnesses, Deputy Sorrow took plaintiff's hands, pulled them behind his back and handcuffed him, saying plaintiff was

under arrest. Plaintiff did not resist in any way. Plaintiff again asked why he was being arrested, but Deputy Sorrow said nothing. Deputy Sorrow held plaintiff's right biceps and walked him through the gate of the apartment complex and over toward the patrol car. They stopped on the near side of the patrol car and stood there for a few seconds. Plaintiff looked to his left and saw Deputies Hicks and Chavez on the other side of the patrol car, with the two African-Americans they had arrested against the car. When he looked back to his right, Deputy Sorrow had a can of pepper spray and sprayed plaintiff in the face. Witnesses saw plaintiff yelling in pain.

Deputy Chavez ran around the patrol car and he and Deputy Sorrow slammed plaintiff to the ground. Plaintiff was in handcuffs, so he could not break the fall and went down on his face. Deputies Sorrow and Chavez started "kneeing and kicking and beating him while he was on the ground." Deputy Sorrow was kicking him in the arms and ribs. Plaintiff was kicked in the side eight to ten times, and "there was what felt like a knee in the back of my neck, pressing my face to the ground. And while I was being held there by the back of my neck, I was being struck on the top, back part of my head." Deputy Chavez was on plaintiff's lower back, and admitted hitting plaintiff multiple times. One of the deputies hit plaintiff in the head with a flashlight.

During the beating, Deputy Sorrow said, "F---ing [N word] lover, you're getting what you deserve." Even though plaintiff at no time attempted to fight or struggle with the deputies, Deputy Sorrow yelled, "Stop fighting." During the beating, witnesses heard plaintiff screaming in pain and pleading for the deputies to stop. After the beating stopped, plaintiff "thought it was over with, and I opened my eyes and I was sprayed across both of my eyes, and then it was sprayed up to my nostrils and sprayed up my nose. And when I opened my mouth to breath, it was pressed against my lips and sprayed into my mouth." Plaintiff lost consciousness.

After the beating, plaintiff looked "bloody and just beat up. He had red marks all over." One witness said, "I just know he was, got his ass whooped, that's it. And it was very bad, that's all I know." During the beating, plaintiff's glasses were knocked from

4

his head, and afterward Deputy Sorrow intentionally crushed plaintiff's glasses with the heel of his foot.

The deputies then "picked [plaintiff] up off the ground from his handcuffs on the back lifting him up." They put him in the back of the patrol car, and Sergeant Kevin Turrill interviewed him on videotape. No *Miranda*[1] warnings were ever given. Plaintiff was in a lot of pain. "My ribs hurt really bad. My face burned really bad. I was – I couldn't feel my hands. My wrists were hurting really bad."

Plaintiff was told he would not be allowed to go to the hospital until he was interviewed. The paramedics at the scene irrigated plaintiff's eyes and advised the police that plaintiff should be taken to the hospital for further evaluation; they wanted to do other treatments at the scene, but Sergeant Turrill "refused to allow them to do certain tasks." Plaintiff told a paramedic he could not feel his hands, and during the interview in the patrol car, plaintiff told the interviewer he was in pain from the handcuffs, but that "it's okay." No one loosened the handcuffs to relieve the pain or checked to see if they were too tight.

Plaintiff was cooperative with Sergeant Turrill at all times, on tape and off tape. After the interview, plaintiff was taken to the hospital where he was handcuffed to a chair. After an hour or so, a nurse came and wiped his face; he was X-rayed and given Vicodin for his pain. The doctor said he could not tell if any ribs were broken, and released plaintiff to jail.

Plaintiff was taken to the Palmdale police station and interviewed again on videotape by Lieutenant Paul Clay. In response to Clay's questions, plaintiff said he had had nothing to drink that night, and did not use illegal or prescription drugs. He described what had happened, and said he did not resist the deputies in any way and was not aggressive toward any deputy. He said there were witnesses, he "was just arrested and beaten by [Deputy Sorrow] without provocation," and he was "scared of that guy."

Both videotaped interviews were played for the jury at the trial of this case.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

While plaintiff was in jail, he continued to have pain in his face and eyes from the pepper spray, and asked for medical attention to take care of the burning sensation, but no one provided any medical treatment. After two days, plaintiff used a carton of milk to try to wash his face.

While awaiting his arraignment, plaintiff was kept in a holding cell with 30 other prisoners and was humiliated when using the cell's toilet in front of 30 other people. After his arraignment, he was placed in a medical ward with 20 or 25 other prisoners. On one occasion, they were all stripped naked and forced to lie face down on the ground for two hours, which was a painful, humiliating and degrading experience. After obtaining bail, plaintiff saw a doctor, who said in all likelihood plaintiff had nerve damage to his hand, and that was why he could not feel his thumb; the doctor also said he "could have possibly had fractures to [his] ribs . . . ."

Plaintiff was prosecuted and acquitted of all charges at his criminal trial. Meanwhile, plaintiff filed this civil action against Deputies Sorrow, Chavez and Hicks and the County of Los Angeles. He alleged causes of action for assault and battery, intentional infliction of emotional distress, and false arrest and false imprisonment against the three deputies, and causes of action for violation of the Bane Act and of Civil Code section 51.7 (the Ralph Act)[2] against all defendants.

In addition to the facts just recited, at trial plaintiff produced an expert witness on police policy and procedure. Lieutenant Otis Dobine, who worked for the Los Angeles Police Department in various capacities from 1969 to 2007, opined Deputy Sorrow was not justified in detaining plaintiff for an investigation because he lacked reasonable suspicion plaintiff was involved in any criminal activity; Deputy Sorrow's conduct restraining plaintiff in the courtyard and taking him outside constituted an arrest; there was no justification for the arrest because Deputy Sorrow himself acknowledged plaintiff

---

**2** The Ralph Act makes unlawful any acts of violence, or intimidation by threat of violence, directed against a person because of his or her actual or perceived political affiliation, membership in a minority or similarly protected class, or position in a labor dispute. (Civ. Code, § 51.7.)

had committed no crime; Deputy Sorrow's use of force during plaintiff's unlawful arrest was improper; even if plaintiff had been properly detained for an investigation, the violent use of force was not justified because plaintiff was not resisting; it was a violation of police policy for Deputy Sorrow to have used the "N" word; and Deputy Sorrow's conduct should have been investigated. Lieutenant Dobine also opined Deputy Sorrow had yelled "stop fighting" during the incident as a cover-up for beating a man who was not resisting.

Medical experts for both sides testified about plaintiff's injuries, and plaintiff presented testimony from two witnesses about other incidents involving Deputy Sorrow.

The jury rendered a special verdict for plaintiff against Deputy Sorrow and the County of Los Angeles. Plaintiff did not prevail on his claims against Deputies Chavez and Hicks. The jury found Deputy Sorrow was acting within the course and scope of his employment during the incident; he lacked probable cause to believe plaintiff had committed a crime; he used unreasonable force in detaining or arresting plaintiff; he violated the Bane Act; his conduct was outrageous; he intended to cause plaintiff emotional distress; and plaintiff suffered severe emotional distress. As to the Ralph Act, the jury found Deputy Sorrow threatened or committed violent acts against plaintiff, but Deputy Sorrow's perception of plaintiff's association with African-Americans was not a substantial factor for his conduct.

The jury awarded past economic damages of $4,500; past and present noneconomic damages of $495,000; and future noneconomic damages of $28,000. In addition, the jury found by clear and convincing evidence that Deputy Sorrow acted with malice, oppression, or reckless disregard for the safety of plaintiff, and awarded punitive damages of $6,000.

Judgment was entered on the jury's verdict, and the trial court denied defendants' motions for judgment notwithstanding the verdict and for a new trial, observing: "The court agrees with the jury that the plaintiff was arrested without probable cause and then was beaten notwithstanding he offered no resistance. The comments Deputy Sorrow made to plaintiff before arresting him and his conduct reflect animus toward him and by

7

extension to the persons in the apartment building that plaintiff managed.  The jury's determination [on damages] is supported by substantial evidence."

The court awarded $989,258 in attorney fees to plaintiff, and refused to tax costs of $26,953.72 for expert witness fees and $24,103.75 for courtroom technology.

Defendants filed a timely appeal.[3]

## DISCUSSION

Defendants contend, as a matter of law, the evidence at trial did not establish a violation of the Bane Act.  They further contend a new trial should have been granted because (1) the trial court erred in admitting evidence of plaintiff's acquittal at his criminal trial and of unrelated incidents involving Deputy Sorrow, and (2) the jury's damages award for present and past noneconomic damages was excessive.  Defendants also challenge the attorney fee award, alleging deficiencies in the billing records, excessive and duplicative time entries and an unjustified 1.2 multiplier.  Finally, defendants claim the trial court abused its discretion in awarding expert witness fees under Code of Civil Procedure section 998 and in failing to tax costs for trial technology and presentation.

We find no merit in any of these contentions.

## 1.  The Bane Act

The Bane Act allows the Attorney General or any city or district attorney to sue in equity "[i]f a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . ."  (Civ. Code, § 52.1, subd. (a); see *Jones, supra,* 17

---

**3**      At the conclusion of briefing, defendants moved to augment the appellate record with 23 pages of deposition transcript excerpts, corresponding to short video clips that were played during the trial but not transcribed by the court reporter and therefore not included in the 17-volume reporter's transcript designated for the appeal.  We grant defendants' motion.

8

Cal.4th at p. 332.) Anyone "whose rights have been interfered with as described in subdivision (a) [may] sue for damages or for equitable relief, and subdivision (h) permits a prevailing plaintiff to recover 'reasonable attorney's fees.'" (*Jones*, at p. 332; see § 52.1, subds. (b) & (h).)

Defendants contend, as a matter of law, Fourth Amendment rights are not among the constitutional rights protected by the Bane Act, unless some other constitutional right is violated at the same time. They reason a defendant cannot "interfere by threats, intimidation, or coercion" with a plaintiff's Fourth Amendment right to be free from an unreasonable seizure, because "coercion is inherent" in any unlawful seizure. For this proposition, they rely on *Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947 (*Shoyoye*), as well as on several federal district court cases. But defendants have fundamentally misread *Shoyoye*, which in no way suggests an unlawful arrest – when accompanied by unnecessary, deliberate and excessive force – is not within the protection of the Bane Act.[4]

Before discussing *Shoyoye* and the federal cases on which defendants rely, we begin with some background. The Bane Act was enacted in response to the increasing incidence of hate crimes in California. (Stats. 1987, ch. 1277, § 3, p. 4544; see *Jones, supra,* 17 Cal.4th at p. 338.) But in *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 843 (*Venegas*), the Supreme Court clarified the Bane Act is not limited to hate crimes, and plaintiffs were not required to show "that County or its officers had a discriminatory purpose in harassing them . . . ."

_____

[4] The trial court below rejected defendants' contention that the Bane Act requires a showing that the threatening, intimidating or coercive act caused a violation of a separate and distinct constitutional right. The trial court also reasoned that, even assuming defendants were correct, the evidence showed "plaintiff's arrest was intended to threaten, intimidate and coerce him from exercising his rights of free speech, free association and freedom from arrest and violence to his person." Because we conclude the Bane Act does not require a showing of a violation of a constitutional right separate from the Fourth Amendment violation, we do not address defendants' additional contention plaintiff did not prove Deputy Sorrow's conduct interfered with plaintiff's First Amendment rights.

In *Venegas*, the Supreme Court held: "[P]laintiffs in this case have alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims. All we decide here is that, in pursuing relief for those constitutional violations under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion. The Court of Appeal was correct in holding that plaintiffs adequately stated a cause of action under section 52.1."[5] (*Venegas, supra,* 32 Cal.4th at p. 843.)

The defendants in *Venegas* did not make the argument defendants raise here: that the Bane Act does not apply because coercion is inherent in an unlawful arrest. No California case supports that proposition, and the federal district court cases defendants cite use broad language that does not apply to the circumstances here or is not supported by the California authorities cited. We conclude defendants' contention has no merit.

Coercion is, of course, inherent in any arrest, lawful or not. But we need not weigh in on the question whether the Bane Act requires "threats, intimidation or coercion" beyond the coercion inherent in every arrest, or whether, when an arrest is otherwise lawful, a Bane Act claim based on excessive force also requires violation of some right other than the plaintiff's Fourth Amendment rights. Where, as here, an arrest is unlawful *and* excessive force is applied in making the arrest, there has been coercion

---

[5]     *Venegas* did not involve the use of excessive force. The police stopped a car driven by the plaintiff's wife that had no license plates or vehicle identification number. They learned the plaintiff was the brother of a suspect in an automobile theft ring they were investigating. They handcuffed the plaintiff after he argued with them, and detained his wife. The plaintiff had no identification card and refused to sign an entry and search waiver form for his home, but agreed to let the officers accompany his wife to get the card. Police assured the plaintiff his home would not be searched, but at the home police had the plaintiff's wife sign a form giving them unconditional authority to search for identification and "'any related investigation in any related . . . law enforcement matter.'" (*Venegas, supra,* 32 Cal.4th at p. 827.) They found the plaintiff was on felony probation and arrested him. The next day an officer ordered plaintiff's release, but he was not released for another two days and no charges were ever filed against him. (*Id.* at pp. 827-828.)

"independent from the coercion inherent in the wrongful detention itself" (*Shoyoye, supra,* 203 Cal.App.4th at p. 959) – a violation of the Bane Act.

We emphasize this is *not* a case involving the use of excessive force during an otherwise lawful arrest based on probable cause. Nor is it a case involving an unlawful arrest or detention, but without any coercion beyond the coercion inherent in any arrest. (See *Shoyoye, supra,* 203 Cal.App.4th at p. 959.) Here, the Bane Act applies because there was a Fourth Amendment violation – an arrest without probable cause – accompanied by the beating and pepper spraying of an unresisting plaintiff, i.e., coercion that is in no way inherent in an arrest, either lawful or unlawful.

The facts in *Shoyoye* demonstrate the difference between *Shoyoye* and this case. In *Shoyoye*, the plaintiff was wrongfully detained in county jail. His initial detention was justified, but the county overdetained him by about 16 days as a result of unintentional clerical error. The court concluded "not every wrongful detention is a violation of [the Bane Act]," and the evidence did not establish the "threats, intimidation, or coercion" necessary for a Bane Act violation. (*Shoyoye, supra,* 203 Cal.App.4th at p. 950.) There is no Bane Act violation "where the overdetention occurs because of mere negligence rather than a volitional act intended to interfere with the exercise or enjoyment of the constitutional right." (*Id.* at pp. 957-958.) So, "where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in County jail, the statutory requirement of 'threats, intimidation, or coercion' is not met. The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself." (*Id.* at p. 959.)

Here, there clearly *was* a showing of coercion separate and apart from the coercion inherent in an unlawful arrest. Deputy Sorrow wrongfully detained and arrested plaintiff, because he had no probable cause to believe plaintiff had committed any crime. But, in addition, Deputy Sorrow deliberately and unnecessarily beat and pepper-sprayed the unresisting, already handcuffed plaintiff. That conduct was not the coercion that is inherent in a wrongful arrest. In *Shoyoye*, by contrast: "Any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail."

11

(*Shoyoye, supra*, 203 Cal.App.4th at p. 961 [county "coerced [Shoyoye] to remain incarcerated," but there was "no evidence that Shoyoye was treated differently than other inmates who were lawfully incarcerated"].)  In short, nothing in *Shoyoye* supports defendants' assertion that where, as here, an unlawful arrest is accompanied by the deliberate and spiteful use of excessive force, a Bane Act claim requires a showing the conduct also "caused a violation of a separate and distinct constitutional right . . . ."

The other cases defendants cite do not support their argument.  None of them involves, as here, both an arrest without probable cause *and* the use of excessive force out of pure spite.  The California case, *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, decided nothing pertinent to this case.  (*Id.* at pp. 865, 881, 883 [two autistic children claimed a teacher engaged in abusive conduct against them while they attended a preschool program; court rejected their Bane Act claim, finding there was "no evidence of acts that could be construed as threats, violence or intimidation that actually caused a loss of their right to an education or that attempted to do so"].)

Nor do the federal district court cases defendants cite support their claim.  The cited cases involve either unlawful arrests without excessive force, or otherwise lawful arrests accompanied or followed by the use of excessive force, or no Fourth Amendment violation at all.  (See, e.g., *Rodriguez v. City of Fresno* (E.D.Cal. 2011) 819 F.Supp.2d 937, 942, 946, 950 [plaintiff sustained injuries as a bystander during the police response to a domestic disturbance at her home; "[a] plaintiff that is injured collaterally or incidentally to the application of force by police against a third party cannot maintain a Fourth Amendment claim"]; *Gant v. County of Los Angeles* (C.D.Cal. 2011) 765 F.Supp.2d 1238, 1243, 1253-1254 [putative class action alleging the defendants "improperly arrested [plaintiffs] on warrants issued for other persons or improperly detained them following their improper arrests"; court concluded "a wrongful arrest and detention, without more, cannot constitute 'force, intimidation, or coercion' for purposes of [the Bane Act]," and the plaintiff "put forth no evidence that the [defendants] used any force, intimidation, or coercion in accomplishing his allegedly unlawful arrest"]; *Lanier v. City of Fresno* (E.D.Cal. Jan. 18, 2011, No. CV F 10-1120 LJO SKO) 2011 U.S.Dist.

12

Lexis 4631, pp. *2-*3, *12-*14 [no Bane Act violation where the plaintiff was driving a stolen vehicle and a police officer shot him multiple times in the back in effectuating his arrest, even though plaintiff attempted to surrender and posed no threat of death or serious physical harm; court found no allegations the officer used threats, intimidation or coercion or interfered with rights separate from those under the Fourth Amendment]; *Barsamian v. City of Kingsburg* (E.D.Cal. 2009) 597 F.Supp.2d 1054, 1064 [only issue raised was whether there was a Fourth Amendment seizure]; *Justin v. City & County of San Francisco* (N.D.Cal. May 5, 2008, No. C 05-4812 MEJ) 2008 U.S.Dist. Lexis 36468, pp. *3, *25, *26 [plaintiffs alleged the defendants violated the Bane Act by the use of violence or threats of violence and by failing to provide medical assistance in the course of decedent's lawful arrest on drug charges, during which he ran away and swallowed 16 small bags of drugs].)

Finally, in their reply brief, defendants cite two more federal cases decided after their opening brief was filed. Both of them relied on *Shoyoye* in rejecting Bane Act claims, and found the plaintiffs made no showing of coercion separate from their underlying excessive force claims. But again, both cases involved claims of excessive force during or after arrests that were otherwise lawful. (*Luong v. City & County of San Francisco* (N.D.Cal. Nov. 19, 2012, No. 11-5661 MEJ) 2012 U.S.Dist. Lexis 165190; *Hunter v. City & County of San Francisco* (N.D.Cal. Oct. 10, 2012, No. 11-4911 JSC) 2012 U.S.Dist. Lexis 146492.)

Moreover, other recent federal cases construe *Shoyoye* as we do. (See, e.g., *M.H. v. County of Alameda* (N.D.Cal. April 18, 2013, No. 11-cv-02868) 2013 U.S.Dist. Lexis 55902, p. *21 ["the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct, and . . . *Shoyoye* applies only when the conduct is unintentional"]; *Bass v. City of Fremont* (N.D.Cal. Mar. 8, 2013, No. C12-4943 TEH) 2013 U.S.Dist. Lexis 32590, pp. *13-*14 [rejecting "a broad reading of *Shoyoye* – one that would, perversely, preclude any [Bane Act] action in which the underlying statutory or constitutional violation involved 'threats, intimidation, or coercion'" and finding such a reading "contrary to the plain language of the statute" and contrary to *Venegas*].)

13

In short, as *Shoyoye* tells us, not every wrongful detention is a violation of the Bane Act. Nor, some federal cases say, is every case of excessive force in the effectuation of an otherwise lawful arrest a violation of the Bane Act. Here, we hold a wrongful detention that is "accompanied by the requisite threats, intimidation, or coercion" (*Venegas, supra*, 32 Cal.4th at p. 843) – "coercion independent from the coercion inherent in the wrongful detention itself" that is "deliberate or spiteful" (*Shoyoye*, *supra,* 203 Cal.App.4th at p. 959) – is a violation of the Bane Act. To the extent any language in the federal cases suggests otherwise, that language does not reflect California law.

## 2. The Denial of Defendants' New Trial Motion

Defendants contend the trial court abused its discretion when it denied their motion for a new trial, citing errors in the admission of evidence and an excessive damages award. We find no merit in these contentions.

"[W]e review an order denying a new trial motion under the abuse of discretion standard," but "in doing so, we must review the entire record to determine independently whether there were grounds for granting the motion." (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 733.) Evidentiary errors, if there were any, would require a new trial only if an objection was timely made and we conclude the admitted evidence "should have been excluded on the ground stated [in the objection] and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.) There is a miscarriage of justice only when it is ""reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."' [Citation.]" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.) A damages award is excessive only if the record, viewed most favorably to the judgment, indicates the award was rendered "as the result of passion and prejudice on the part of the jurors." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 (*Bertero*).)

### a. The asserted evidentiary errors

#### i. Evidence of unrelated incidents involving Deputy Sorrow

Two witnesses testified about unrelated incidents involving the use of excessive force by Deputy Sorrow.

Crystal Engleton testified about an incident involving her boyfriend, Devon Moss. Deputy Sorrow and another deputy responded to a neighbor's call reporting that Engleton and Moss were fighting. When Deputy Sorrow entered the apartment, Moss was lying on the bed having an asthma attack; "[h]e couldn't breathe." Engleton heard a loud noise, and came into the room to find Moss on the floor in handcuffs. Deputy Sorrow called Moss a coward and a punk for hitting a girl (which Engleton said never happened). Moss told Deputy Sorrow to quit calling him a punk, and then he called Deputy Sorrow a bitch. Deputy Sorrow appeared to get angry; his face turned red and he started to yell. He put his knee on Moss's back while Moss was handcuffed, and more words were exchanged. Deputy Sorrow "got [Moss] up by the handcuffs," appearing to cause pain to Moss, who was screaming as if in pain. They went out the front door and Deputy Sorrow held Moss over the second-floor rail as if to push him over. Engleton said "I don't know if he was going to actually throw him, but [Moss] looked really scared." Deputy Sorrow appeared to be angry, "[b]ecause he was still yelling, cursing and screaming at [Moss]." Then, he positioned Moss on the wall and banged Moss's head against the wall about three times, while Moss was in handcuffs. Moss appeared to lose consciousness for a few seconds. Moss was not taken to jail or arrested. Later, Engleton and others took him to the hospital where he received treatment for his asthma attack.

The other witness was William Perrino. He testified he had been punched in the face and called police. Deputy Sorrow and two others responded to the call. Perrino was drunk, and an altercation ensued with the other two deputies, who handcuffed him and then beat him. Deputy Sorrow then took Perrino to the hospital in his police vehicle. When Deputy Sorrow put Perrino in the back of the police vehicle, he did not fasten the seatbelt. On the way to the hospital, Deputy Sorrow asked Perrino why he had had a fight with the deputies, and Perrino said "he knew as well as I did that the deputies

15

assaulted me; I didn't assault them." They were "traveling down the road about 60 miles an hour," and Deputy Sorrow "slammed on the brakes." Perrino "became a human pinball in the back seat. I bounced around the back seat, ended up on the floor." His face hit the screen that separates the back seat from the front seat, and he was injured. When they got to the hospital, Deputy Sorrow "grabbed me by the handcuffs and jerked me out [of the patrol car]," causing Perrino pain, and "telling me that he was going to beat the shit out of me when we got back to the station."

Defendant, in a one-page argument, contends the admission of the testimony from Engleton and Perrino "constituted additional prejudicial and cumulative evidence, in violation of Evidence Code [sections] 352 and 1101." Defendants argue "the impact of testimony about these unrelated incidents cannot be under-estimated," but provide no explanation of why the admission of this evidence was improper or why it was prejudicial. On this basis alone, we could dismiss the claim of error as having been waived.

But there was no error. Evidence Code section 1101 makes evidence of specific instances of a person's conduct inadmissible when offered to prove his or her conduct on a specified occasion. (§ 1101, subd. (a).) But such evidence is admissible when relevant to prove some fact (such as intent, or absence of mistake or accident) "other than his or her disposition to commit such an act" (*id.*, subd. (b)), and section 1101 does not affect "the admissibility of evidence offered to support or attack the credibility of a witness" (*id.*, subd. (c)).

In this case, Deputy Sorrow claimed force was necessary because plaintiff was resisting being detained. Deputy Sorrow also testified he was trying to disarm the situation, used measured responses (the "lowest amount of force that the sheriff's department has, which is pepper spray"), and had "to gain control of him." The evidence from Engleton and Perrino was admissible to impeach Deputy Sorrow's claim he used force because of plaintiff's provocation and used measured responses to gain control of him. (See *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 944-946 ["Evidence [the officer] had a practice of bullying and assaulting other persons

16

under his custody without provocation or apparent reason would tend to show that the injuries suffered by plaintiff were not the product of efforts to control him, but were inflicted intentionally and with malice"]; see also Evid. Code, § 1105 ["Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."].)

The evidence was properly admitted.

### ii. The evidence of plaintiff's criminal acquittal

Defendants contend the trial court erred in admitting evidence that plaintiff was acquitted at his criminal trial. Defendants sought to exclude that fact on grounds it was irrelevant, immaterial, prejudicial and likely to confuse the issues. The court was inclined to agree with defendants, but plaintiff contended, citing federal precedent, the evidence was admissible, with a limiting instruction, to support his claim for damages for the legal fees he incurred at his criminal trial, and the court agreed. The defendants agreed that plaintiff could recover his attorney fees but argued that the jury did not need to know the result of the criminal trial.

After plaintiff testified that it took over a year to get his criminal case to trial and that eventually he "won" that case (and before plaintiff's testimony was completed), the court gave a limiting instruction. The court told the jury: "This evidence is offered for the limited purpose of supporting [plaintiff's] claim for compensation for the legal fees he incurred in the criminal trial. The evidence shows what legal work was done and the result of that legal work in connection with the criminal charges. [¶] The jury should not consider the evidence of acquittal as proof as to whether there was probable cause for [plaintiff's] arrest. The court will provide instructions later about the probable cause that is required to make an arrest."

Then, later in the trial, after moving for a directed verdict, the defendants provided the court with California legal authority that plaintiff could not recover the attorney fees as damages. When the court later instructed the jury, it added to the limiting instruction previously given, stating: "The court now adds this addition: [¶] The court has

17

determined that plaintiff Noel Bender may not claim as economic damages the attorney's fees he incurred in the criminal trial."

Defendants claim admission of the evidence of acquittal was erroneous and "highly prejudicial." We reject defendants' assertion that the admission of this evidence requires a new trial.

Assuming it was error to admit the evidence of acquittal, defendants have not shown the error resulted in a miscarriage of justice. Defendants argue the evidence of plaintiff's criminal acquittal "had to have had an overarching impact on the jury's assessment of the subject incident," but we are not persuaded. Our review of the record shows an abundance of evidence from disinterested witnesses that Deputy Sorrow arrested plaintiff without any reason to do so, and pepper-sprayed and beat him while he was handcuffed and unresisting. In addition, there was powerful evidence from witnesses Engleton and Perrino about other incidents of Deputy Sorrow's use of excessive force. The jury found misconduct by Deputy Sorrow, but not by Deputies Hicks and Chavez, suggesting it paid close attention to the evidence. Juries are presumed to have followed the instructions they were given, and this jury was twice instructed the evidence of acquittal was offered for a limited purpose and they "should not consider the evidence of acquittal as proof as to whether there was probable cause for [plaintiff's] arrest." In short, we agree with the trial court's view the evidence of acquittal did not prejudice defendants "in light of the entirety of the evidence and the jury instructions." We may find a miscarriage of justice only if it is reasonably probable a result more favorable to the defendants would have been reached if the jury had not known about plaintiff's acquittal. No such probability is reflected in this record.

Defendants also contend the error in admitting evidence of plaintiff's criminal acquittal "was compounded by the failure to admit evidence that there had been a judicial finding of probable cause for Plaintiff's arrest." Defendants do not cite the record; nor do they cite any authorities on this point. And, when the court indicated its view defendants should be precluded from using any probable cause determination by a judicial officer on the criminal charges against plaintiff, defense counsel agreed, saying, "I think that's fair."

18

In short, defendants have shown no error. (See also *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 768 ["a magistrate's finding of probable cause to hold a defendant for trial is not a finding of probable cause to arrest (or detain)"].)

### b. The claim of excessive damages

Defendants contend the trial court erred in denying its new trial motion because the jury's damages award for present and past noneconomic damages ($495,000) was excessive. We find no abuse of the trial court's discretion.

The jury "is entrusted with vast discretion in determining the amount of damages to be awarded," and a reviewing court will reverse or reduce the award only "'"'"where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice . . . ."'" [Citations.]" (*Bertero, supra,* 13 Cal.3d at p. 64.)

In denying defendants' request for a new trial, the trial court explained: "The damages are high but not so much as to shock the conscience of the court. The court agrees with the jury that the plaintiff was arrested without probable cause and then was beaten notwithstanding he offered no resistance. The comments that Deputy Sorrow made to plaintiff before arresting him and his conduct reflect animus toward him and by extension to the persons in the apartment building that plaintiff managed. The jury's determination is supported by substantial evidence."

Defendants say the trial court justified the damages award on the basis of Deputy Sorrow's animus toward plaintiff and the tenants, and contend there was "very limited evidence at trial regarding any such 'animus,'" pointing to the jury's decision on the Ralph Act claim that Deputy Sorrow's "perception of [plaintiff's] association with African-Americans" was not a substantial factor for his violent acts against plaintiff. But Deputy Sorrow's animus was not the only factor the trial court considered in finding the damages were not excessive. The court also found plaintiff was arrested without probable cause and then beaten even though he offered no resistance. And the trial court obviously did not agree with defendant's characterization of the animus evidence as "very limited."

19

Defendants also point out the jury awarded only $28,000 in future noneconomic damages. Defendants argue the "wide disparity" between the award for present and past, versus future, noneconomic damages is "extraordinary," and "cannot be reconciled" with trial testimony from plaintiff's therapist that he would need continued psychological treatment on a weekly basis for one to two years, and testimony from plaintiff that he still felt the emotional effects from the incident. This argument is not supported by any authority, and is without merit. It is up to the jury to weigh the evidence and assess the noneconomic loss. There is simply no basis for challenging on appeal the jury's assessment that plaintiff suffered most of his noneconomic damages during the 22 months between the date of the assault and the verdict.

In short, there is no basis upon which this court could conclude the damages award was excessive. As the Supreme Court stated in *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507, "It must be remembered that the jury fixed these damages, and that the trial judge denied a motion for new trial . . . . These determinations are entitled to great weight. . . . [A]ll presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." No such ground exists here.

## 3. The Attorney Fee Award

The trial court awarded $989,258 in attorney fees under the Bane Act. Defendants contend the matter should be remanded to the trial court for a re-examination of the attorney fee award. We find no basis for doing do.

The trial court, in a detailed ruling, initially found fault both with plaintiff's application for attorney fees and with defendants' opposition to it. Plaintiff sought nearly $1.5 million, and the court stated it would award fees in a substantially lesser sum. The court criticized plaintiff's recordkeeping practices and presentation, and criticized defendants for failing to quantitatively analyze plaintiff's billing records in order to

submit different estimates of reasonable fees. The court prepared a tabulation "as a beginning point to determine a reasonable number of hours and a reasonable billing rate for tasks necessary to the litigation," set different reasonable hourly rates for trial and nontrial time, and discounted certain hours. The court found a multiplier for trial counsel's fees was proper, and stated it would set the multiplier at 1.1 or 1.15. The court requested "each side provide a new calculation of recoverable legal fees based on the court's comments."

Both parties submitted extensive supplemental briefing and documentation on the attorney fees. Defendants submitted a chronological table organizing plaintiff's billing entries and showing defendants' objections and proposed deductions for entries they claimed were vague, duplicative, and for travel time that should not be compensated. Defendants calculated total fees at $670,437 with a 1.15 multiplier for trial counsel's time (though they claimed hourly rates should be lower and fees should total $412,945). Plaintiff argued, among other things, defendants' litigation conduct had dramatically increased time on the case; plaintiff calculated fees at $1,002,915 with a 1.15 multiplier (but claimed rates should be higher and fees should total $1,231,069.25).

Using a 1.2 multiplier, the court awarded $989,258 as a reasonable legal fee under the Bane Act, calculating the lodestar value by multiplying a reasonable number of hours for the result achieved by reasonable hourly rates, and adjusting the lodestar by the multiplier to reflect relevant factors identified in *Serrano v. Priest* (1977) 20 Cal.3d 25. The court again issued a detailed ruling explaining its decision. It used lower hourly rates for nontrial work. After reviewing plaintiff's outline of services performed, defendants' table of entries and objections, and new declarations from plaintiff's counsel, the court was "satisfied that the total number of hours that plaintiff's lawyers devoted to the matter is accurately reported and, given the combative nature of this litigation, appropriate."

The trial court was entitled to give credence to the additional details in the billing records plaintiff submitted in the supplemental briefing requested by the court. (See *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 396 ["verified time statements of the attorneys, as officers of the court, are entitled to

21

credence in the absence of a clear indication the records are erroneous"].) The trial court expressly stated it was satisfied counsel's hours were accurately reported and appropriate, and defendants have given us no reason to conclude otherwise. (See *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*).) We find no abuse of discretion in the court's determination of the number of hours reasonably incurred.

Nor was the application of the multiplier an abuse of discretion. It is well-established the lodestar may be adjusted based on factors including those the trial court used here: the contingent nature of the award, the legal skill displayed in presenting the issues, and the extent the litigation precluded other employment. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*), citing *Serrano v. Priest, supra,* 20 Cal.3d at p. 49.) "In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum,* at p. 1132.)

Here, the court explained the 1.2 multiplier, observing the case was a "double contingency," requiring proof both of excessive force claims and of liability on a statutory cause of action authorizing recovery of legal fees. The court noted counsel put both their time and their purse at risk, investing capital to pay trial expenses; that the time invested limited trial counsel's availability for other cases; that counsel achieved a trial victory "against the united testimony of three deputy sheriffs, and over a vigorous defense"; and that their prosecution of the case was "tenacious, skillful and effective." The court acknowledged payment of the legal fees by the taxpayers counted against a high multiplier, but "every excessive force case in which a plaintiff prevails encourages better supervision within our police agencies and thus reinforces the constitutional protections to which citizens are entitled."

Defendants contend the multiplier is improper because of the "straightforward allegations" in the case, the "substantial hourly rate" (e.g., $650 for trial work and $450 for nontrial work), the award of nearly all the hours claimed, and payment of the fees by a public entity; they also assert this was merely an ordinary contingency case and criticize

use of the "purportedly 'skillful' prosecution of the case" to support the multiplier. But nothing defendants say demonstrates any legal error in the trial court's analysis.

This is not a case like those defendants cite where the application of a multiplier was unsubstantiated. (See *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 629 [reversing a 2.5 multiplier, where the case was resolved without the risk of trial, and the lodestar calculation fully compensated counsel at their respective professional rates for the hours spent on the litigation].) While defendants attack use of the contingency and skill factors, their arguments do not amount to a showing that the trial court's analysis was "clearly wrong." (*PLCM Group, supra*, 22 Cal.4th at p. 1095.)

There was no abuse of discretion in the fee award.

## 4. The Denial of Defendants' Motion to Tax Costs

Defendants challenge the denial of their motion to tax costs for expert witness fees and for trial technology.

### a. Expert witness fees

Early in the litigation, plaintiff made, and defendants did not accept, a settlement offer of $399,999 under Code of Civil Procedure section 998 (section 998). Defendants objected to the offer, contending it was unreasonable because the action was filed on July 2, 2010, and the offer was made on September 30, 2010, when the complaint was "not yet at issue." Defendants' demurrer had not yet been heard, and defendants contend they had no basis on which to measure the reasonableness of the offer without the benefit of discovery. (See *Najera v. Huerta* (2011) 191 Cal.App.4th 872, 878 ["An important factor in deciding whether a section 998 offer is unreasonable or in bad faith is whether the offeree was given a fair opportunity to intelligently evaluate the offer."].)

The trial court disagreed and awarded plaintiff $26,953.72 for the costs of two experts. The court pointed out that plaintiff's acquittal in the criminal trial preceded the section 998 offer by three days; the three deputies and plaintiff testified in the criminal trial; and, while the transcripts of that trial probably were not available, "defense counsel were aware that the jury found contrary to the deputies' testimony." Further, the sheriff's department had internally investigated the incident and its findings were available to

23

defense counsel. Moreover, the court found "the demurrer itself was meritless." The court concluded that under these circumstances, defendants "had sufficient information to evaluate the 998 offer" and, if they required more time to seriously consider it, could have asked for an extension of the offer.

The trial court correctly found defendants had sufficient information to evaluate the reasonableness of the offer. We find no abuse of discretion in the trial court's award of expert witness fees under section 998.

Defendants also say plaintiff provided no documentation to prove the expert fees were actually incurred and were reasonable. But "[a] 'verified memorandum of costs is prima facie evidence of [the] propriety' of the items listed on it, and the burden is on the party challenging these costs to demonstrate that they were not reasonable or necessary." (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1486.) Defendants point to no evidence even suggesting that the expert witness fees were unreasonable. In any event, "[w]hether an item listed on the memorandum was reasonably necessary is a question of fact to be decided by the trial court," and the trial court "is in the best position to evaluate the importance of expert witnesses at trial, and therefore is in the best position to evaluate the reasonableness of the expert witness fees listed in the memorandum of costs." (*Id.* at p. 1487.) There was no error in the award of expert witness fees.

### b. Costs for trial technology

Under Code of Civil Procedure section 1032, the prevailing party is entitled as a matter of right to recover costs. Section 1033.5 identifies cost items that are allowable under section 1032 (§ 1033.5, subd. (a)); identifies items that are not allowable (*id.,* subd. (b)); and further provides that "[i]tems not mentioned in this section . . . may be allowed or denied in the court's discretion." (*Id.*, subd. (c)(4).) Any allowable costs must be "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation," and reasonable in amount. (§ 1033.5, subd. (c)(2), (3).) We review a costs award for abuse of discretion.

Plaintiff's memorandum of costs included a claim for $24,103.75 for courtroom presentations. These costs consisted of "'Trial Video Computer, PowerPoint Presentation

24

and Videotaped Deposition Synchronizing'" and the cost of a trial technician for nine days of trial. Plaintiff used a PowerPoint presentation in closing argument that consisted of a detailed summary of trial testimony, documents and other evidence as well as a "comprehensive evaluation of such evidence *vis a vis* jury instructions." The costs included charges for creating designated excerpts from deposition transcripts and video, converting exhibits to computer formats (Tiff's & JPEG's), and design and production of electronic presentations. Defendants' motion to tax costs challenged this item, contending case law establishes these costs are not recoverable and that similar costs were "specifically disallowed" in *Science Applications Internat. Corp. v. Superior Court* (1995) 39 Cal.App.4th 1095, 1103 (*Science Applications*).

The trial court carefully considered all of defendants' contentions but ultimately declined to tax any part of these costs, explaining its reasoning in considerable detail. In essence, the court thought the costs should be allowed – in a case like this where attorney fees are recoverable costs – if the services in question "enhanced counsel's advocacy during the trial," so long as the costs were "reasonably necessary to the conduct of the litigation." The court found both points to be so: the synchronizing of the videotaped depositions, for example, including the cost of employing a projectionist to recover and retrieve the excerpts selected by counsel, both enhanced counsel's advocacy during trial and was reasonably necessary to the conduct of the litigation.

Defendants contend, based on *Science Applications*, the costs at issue are "explicitly nonrecoverable" and the trial court "had no discretion to award them." In *Science Applications*, the appellate court approved some technology costs and disapproved others. It approved costs of over $57,000 for graphic exhibit boards and over $101,000 for a video "to help the jury appreciate the difference" between manual and computer-assisted dispatch systems that were an issue in the case. (*Science Applications, supra,* 39 Cal.App.4th at p. 1104.) It disallowed costs of $200,000 for "document control and database for internal case management"; more than $47,000 for "the production of laser disks 'containing' trial exhibits"; a "graphics communication system" with costs of more than $9,000 for equipment rental and $11,000 for an on-site

25

technician; and more than $35,000 "to have videotape depositions edited for effective presentation of the testimony to the jury." (*Id.* at pp. 1104-1105.) The *Science Applications* court was concerned with technology costs in "staggering proportions," observing if costs "are routinely awarded for high-powered technology, most parties will be unable to litigate." (*Id.* at p. 1105.)

Almost 20 years have passed since *Science Applications* was decided, during which time the use of technology in the courtroom has become commonplace (including a technician to monitor the equipment and quickly resolve any glitches), and technology costs have dramatically declined. In a witness credibility case such as this, it would be inconceivable for plaintiff's counsel to forego the use of technology to display the videotapes of plaintiff's interviews after his beating, in the patrol car and at the sheriff's station, and key parts of other witnesses' depositions. The court in *Science Applications* was "troubled by review of a case in which a party incurred over $2 million in expenses to engage in high-tech litigation resulting in recovery of only $1 million in damages." (*Science Applications, supra,* 39 Cal.App.4th at p. 1105.) This is not such a case. The costs at issue total just over $24,000, and the trial court specifically found the trial technology enhanced counsel's advocacy and was reasonably necessary to the conduct of the litigation. The court acted well within its discretion in allowing recovery of these costs.

## DISPOSITION

The judgment is affirmed. Plaintiff shall recover his costs on appeal.


GRIMES, J.

We concur:


BIGELOW, P. J.


FLIER, J.

26