**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HERIBERTO RODRIGUEZ; CARLOS
FLORES; JUAN CARLOS SANCHEZ;
ERICK NUNEZ; JUAN TRINIDAD,
        *Plaintiffs-Appellees*,

v.

COUNTY OF LOS ANGELES; LOS
ANGELES COUNTY SHERIFF'S
DEPARTMENT,
        *Defendants*,

and

DANIEL CRUZ; MATTHEW ONHEMUS;
CLAYTON STELTER; JUSTIN BRAVO;
HERMAN DELGADO; ADRIAN RUIZ;
CARLOS ORTEGA; FRANCISCO
ALONSO; CHRISTOPHER BLASNEK;
MICHEL MCGRATTAN; KELLEY
WASHINGTON; ALEJANDRO
HERNANDEZ CASTANON; ARTHUR
DIAZ, JR.; MICHAEL FRAZIER;
ANTONIO GALINDO; ARMANDO
GONZALEZ; MATTHEW NOWOTNY;
JOSEPH SANFORD; HECTOR
VAZQUEZ; IVAN DELATORRE; JOHN
MCNICHOLAS,
        *Defendants-Appellants*.

No. 13-56292

D.C. No.
2:10-cv-06342-
CBM-AJW

HERIBERTO RODRIGUEZ; CARLOS
FLORES; JUAN TRINIDAD; JUAN
CARLOS SANCHEZ; ERICK NUNEZ,
                    *Plaintiffs-Appellees*,

                    v.

COUNTY OF LOS ANGELES; DANIEL
CRUZ; CHRISTOPHER BLASNEK;
MATTHEW ONHEMUS; MICHEL
MCGRATTAN; KELLEY
WASHINGTON; CLAYTON STELTER;
JUSTIN BRAVO; FRANCISCO ALONSO;
ALEJANDRO HERNANDEZ
CASTANON; MICHAEL FRAZIER;
JOSEPH SANFORD; HECTOR
VAZQUEZ; NICHOLAS GRAHAM;
BLAKE ORLANDOS; MATTHEW
THOMAS; JAVIER GUZMAN; ANDREW
LYONS; ADOLPH ESQUEDA; HERMAN
DELGADO,
                    *Defendants-Appellants.*

No. 14-55374

D.C. No.
2:10-cv-06342-
CBM-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted August 31, 2017
Pasadena, California

Filed May 30, 2018

Before:  William A. Fletcher and Sandra S. Ikuta, Circuit
Judges, and Sarah Evans Barker,[*] District Judge.

Opinion by Judge W. Fletcher

**SUMMARY[**]**

**Prisoner Civil Rights**

The panel affirmed the district court's judgment in favor
of plaintiffs following a jury trial, award of compensatory and
punitive damages, and award of attorney's fees in a 42 U.S.C.
§ 1983 action brought by five prisoners who were severely
injured during the course of cell extractions at the Los
Angeles County Men's Central Jail.

The panel first denied appellants' request to vacate the
final judgment on the basis that the district court lacked
jurisdiction to go to trial during the pendency of appellants'
interlocutory appeal from a prior qualified immunity ruling.
The panel held that although the district court failed to certify
pursuant to *Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir.
1992), that the interlocutory appeal was frivolous, any error
was harmless.

---

[*] The Honorable Sarah Evans Barker, United States District Judge for
the Southern District of Indiana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Addressing the issue of exhaustion of administrative remedies under the Prison Litigation Reform Act, the panel held that the district court did not clearly err in finding that a reasonable fear of retaliation made the grievance system effectively unavailable for appellees, and that appellants failed to carry their burden of proof showing otherwise.

The panel held that the district court did not err by denying appellants' Fed. R. Civ. P. 50(b) motion, based on qualified immunity, for judgment as a matter of law. The panel held that there was abundant evidence presented to the jury that appellants inflicted severe injuries on appellees while they were not resisting, and even while they were unconscious. A jury could reasonably reject appellants' argument that they acted reasonably and instead determine that the force was not part of a good-faith effort to maintain or restore discipline. The panel therefore rejected appellants' sufficiency of the evidence challenge to the jury's finding of a constitutional violation.

The panel also found unpersuasive appellants' arguments that the law regarding their conduct was not clearly established. Addressing the liability of the deputy appellants, the panel held that no reasonable deputy in appellants' position would have believed that beating a prisoner to the point of serious injury, unconsciousness, or hospitalization solely to cause him pain was constitutionally permissible. The panel rejected the argument that the limits on the proper use of tasers were still unclear as of 2008, stating that once a jury has determined on the basis of sufficient evidence that prison officials maliciously and sadistically used more than *de minimis* force to cause harm, contemporary standards of decency, and thus the Eighth Amendment, always are violated.

The panel held that the supervisor appellants—the sergeants who directed the extraction teams and their superiors—were not entitled to qualified immunity. The panel held that to the extent that these appellants stood by and observed the extractions but knowingly refused to terminate the deputies' unconstitutional acts, they were individually liable. The panel determined that ample evidence—including appellants' own testimony—supported the conclusion that appellants directed and observed most of the extraction teams. The panel held that although it was unclear whether Captain Cruz directly observed all of the extractions, a jury could reasonably find the requisite causal connection to hold Cruz liable for his own culpable action or inaction in the training, supervision, or control of his subordinates.

The panel rejected the argument that the supervisors had immunity under state law and therefore could not be held liable under the Bane Act, California Civil Code § 52.1. The panel first held that California Civil Code § 820.2 does not shield government employees who use excessive force in carrying out their duties and that § 820.8 was inapplicable because appellees did not rely on vicarious liability. The panel concluded that in excessive force cases, including Eighth Amendment cases, § 52.1 does not require proof of coercion beyond that inherent in the underlying violation. Because appellees provided evidence sufficient to support a finding that they were subjected to excessive force in violation of the Eighth Amendment, they necessarily provided evidence sufficient to support a finding of a violation of their rights under the Bane Act.

The panel held that the record amply supported the jury's verdict and the district court's ruling of municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*,

436 U.S. 658, 694 (1978).  The panel held that there was substantial evidence of repeated constitutional violations, of the Los Angeles County Sheriff's Department awareness of those violations, and of its failure to take any remedial action. The panel concluded that legal precedent permitted the jury to infer that the Sheriff's Department had adopted a custom or practice of condoning excessive force and that this culture of violence and impunity proximately caused the injuries inflicted on appellees.

The panel held that the record did not require a finding of implied juror bias that allegedly arose from the professional activities of a juror's parents and the juror's personal friendships with other individuals having some involvement with the prison system.  The panel upheld the award of $210,000 in punitive damages award against the supervisory appellants, stating that the appellees proved egregious, even shocking, abuses of power.  The panel further noted that the punitive damages awarded to each appellee, considered individually or together, were all far less than appellees' compensatory damages.

Addressing appellants' claims of trial errors, the panel held that the district court acted within its broad discretion in declining to bifurcate the *Monell* claim and in excluding, under Federal Rule of Evidence 403, evidence of appellees' felony convictions and their gang membership.  The panel further found no error in the district court's jury instructions and determined that the district court reasonably denied the application to compel live testimony for four appellees and non-party inmates.

The panel affirmed the district court's attorney's fee award of $5,378,174.66.  The panel held that the fee limit

provisions of the Prison Litigation Reform Act do not apply to attorney's fees incurred in litigation under California Civil Code § 52.1. Finally, the panel found no fault in the district court's decision to apply a 2.0 multiplier, given the financial risk assumed by appellees' counsel, the difficulty of representing prisoners in an excessive force action against high-ranking jail officials who engage in aggressive opposition, and the opportunity costs that the years-long litigation in this case required. The panel noted that the district court had considered the burden to California's taxpayers that the fee award would represent, and found that the award was justified given the factors described above and the importance of civil rights suits in protecting the public against abuses at the hands of large or politically powerful defendants.

## COUNSEL

David D. Lawrence (argued) and Jin S. Choi, Lawrence Beach Allen & Choi P.C., Glendale, California; Andrew C. Pongracz, Seki Nishimura & Watase LLP, Los Angeles, California; for Defendants-Appellants.

Caitlin S. Weisberg (argued), Barrett S. Litt, and Ronald O. Kaye, Kaye McLane Bednarski & Litt LLP, Pasadena, California; James S. Muller, Offices of James S. Muller, Glendale, California; for Plaintiffs-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

In 2008, corrections staff at the Los Angeles County Men's Central Jail performed "cell extractions" in two high-security units in the course of quelling a disturbance. Appellees, five prisoners in the jail, were severely injured during the extractions. They brought suit in federal district court, alleging that appellants violated their rights under the Eighth and Fourteenth Amendments. After a month-long trial, a jury found nineteen Los Angeles County Sheriff's Department ("LASD") employees and the County of Los Angeles liable for appellees' injuries under 42 U.S.C. § 1983 or California Civil Code § 52.1, or both. The jury awarded $740,000 in compensatory damages and $210,000 in punitive damages. The court awarded more than $5 million in attorney's fees.

We affirm.

## I. Background

### A. Factual History

Because this appeal follows a jury verdict in appellees' favor, we relate the facts in the light most favorable to them. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1064 n.1 (9th Cir. 2016) (en banc).

### 1. Cell Extractions

On August 25, 2008, there was a disturbance in Modules 3100 and 3300 of the Los Angeles County Men's Central Jail, two high-security units in which prisoners were housed in single-person cells. Prisoners in the units lit fires, flooded toilets, shattered sinks, and threw shards of porcelain. Appellees described the disturbance as a "protest," organized in response to repeated uses of excessive force by jail officials. Appellants described it as a "riot." The district court instructed the parties to use the term "incident" in front of the jury.

To restore order, appellant Captain Daniel Cruz, unit commander, and appellant Lieutenant Christopher Blasnek, incident commander, planned a series of cell extractions. Under the stated terms of the plan, prisoners would have an opportunity to "cuff up" and leave their cells voluntarily. Prisoners who refused to cuff up would be forcibly extracted. Four LASD sergeants would lead four separate extraction teams of several deputies, with each deputy on a team having an assigned role. "Shield deputies," covered with protective gear and carrying a shield, would enter first to pin the prisoner against a wall or to knock him to the ground. "Capture deputies" would follow close behind to restrain the

prisoner. In the event that these deputies were unable to subdue a prisoner, "taser deputies" would administer electric shocks in "stun mode" until the prisoner was subdued. Official LASD policy required extraction teams to use the "lowest possible level" of force to "overcome only that level of resistance confronting the team." Extraction teams were prohibited from using force to punish prisoners. Appellees were among those who were forcibly extracted.

Appellee Carlos Flores testified that, prior to his own extraction, he could hear cell extractions occurring in other cells. "[P]eople were crying out in pain, telling the deputies to stop. And I could hear the punching and kicking. And I could hear boots stomping. I could hear the deputies sometimes laughing." When deputies approached Flores's cell, "they were all wearing ski masks, I couldn't see their faces." A deputy shot into Flores's cell with a 40 mm "block gun," but Flores was not hit because he was protecting himself with his mattress. Deputies then threw one or two concussion grenades into Flores's cell. They entered the cell, and one deputy used his shield to push Flores down onto his back. Five or six deputies then landed on top of Flores and the deputy. Several deputies held Flores down while others punched and kicked him in his face, head, and body. Deputies took turns, alternating between hitting and tasing him. "I could feel them stomping on my legs, trying to twist my leg." As one deputy was hitting Flores, "he was just telling me, 'Mother-Fucker. Mother-Fucker.' " "[T]hey were telling me to stop resisting, and . . . I was trying to say, 'I'm not resisting.' " "[T]hat's . . . a thing that the deputies do at the jail . . . . [T]hey'll beat inmates and say 'Stop resisting, stop resisting.' But it's like they know you're not resisting. . . . They just want to beat you up." After one of the tasers quit working, a deputy used the butt of the taser to hit

Flores in the face and head. The repeated blows from fists, boots, and the taser broke Flores's nose and eye socket. "The last thing I felt before I woke up in the hospital room . . . was the whole right side of my face, just I felt the bone break because he . . . kept hitting me in the same spot." "It was the worst thing I ever felt. . . It was so painful that I just blacked out from the pain." In the hospital afterwards, "the doctor explained to me that my nose had been broken pretty bad and that he had to go in there and . . . cut off a piece of some cartilage in order to move the bone back in place or something like that." "[H]e explained to me . . . how my cheek bone holds my eye into place, and . . . the fracture to my . . . cheek bone had kind of like made my eye sunk down out of the socket. So he had to go in there and . . . put . . . two metal plates or something, and some screws, and . . . basically put my . . . eye socket back together. So that way, . . . my eye is not hanging at an odd angle out of my face."

Appellee Juan Carlos Sanchez testified that before his extraction began a deputy appeared on his tier and stated, "You guys are going to get your ass beat." When an extraction team came to Sanchez's cell, a deputy shot at him with the block gun. He was not hit because he was protecting himself with his mattress. Deputies then threw a concussion grenade that exploded between his legs. Deputies entered the cell and threw Sanchez onto the floor on his stomach. A deputy handcuffed him with his hands behind his back. That deputy began "socking me in my face, punching me in my face, just punching me." Sanchez was struck in the face until he bled. Other deputies then came into the cell. "[T]hey come in and started kicking me, stomping me out, . . . just jumping on my legs." They broke Sanchez's left ankle. Deputies told Sanchez to "stop fighting," but "I wasn't fighting." Deputies later told him to "stop resisting," even

though he was not resisting. Sanchez was dragged out of the cell unconscious. Sanchez regained consciousness outside the cell, still handcuffed and lying on his stomach. Now outside the cell, deputies kicked Sanchez in the face and tased him repeatedly. They pulled down his pants and "tasered me on my butt." At the hospital afterwards, doctors put permanent metal pins in Sanchez's broken ankle. Sanchez was in a wheelchair for three to four months, and was not able to walk without crutches or a walker for eight or nine months. At the time of trial four years later, Sanchez still walked with a limp. Sanchez had received a large "gash" above his right eye. The gash had healed by the time of trial, but it was "always tingling." Sanchez's right eye was swollen shut for two weeks. At the time of trial, vision in that eye was blurred.

Appellee Erik Nunez testified that before entering his cell deputies shot him four or five times with large rubber or wooden bullets from a block gun. They then threw a concussion grenade into the cell. When they came into the cell, they pushed Nunez to the floor. Nunez "immediately . . . began feeling blows." Deputies kicked him with "hard boot[s]" on his face, back, and sides. Deputies hit Nunez with their fists and jumped on his back. Nunez tried to cover his head to protect himself, but deputies grabbed his arms and continued to beat him. "I heard them saying . . . the whole time I was on the floor, 'Stop resisting' until the moment I came out of the cell." Nunez testified that this was typical: "[Y]ou always hear them say, 'Stop resisting," and [inmates] are not even resisting. . . . That's their justification." Deputies tased Nunez repeatedly. "I kept getting tasered, and I was hoping that I would pass out. But . . . it was like . . . I would come right back to it with the taser." "[A]fter the first tase, I was already out of it, . . . and then he just kept tasing

and tasing me." "This guy, he's laughing, the guy that's tasing me. He grabbed it, and he put it . . . [b]etween my butt cheeks, and he's tasing me, and he's laughing." On a scale of one to ten, Nunez rated his pain at eleven. The tasing left marks on Nunez's skin—"[b]lack marks, like wounds, like two holes, like burn marks, like burned skin."

Appellee Juan Trinidad testified that he heard other cell extractions before deputies came to his cell. "You could hear all the pain. People are screaming and everything else." "[Y]ou hear the same thing as usual, 'Stop resisting,' and they keep beating [the inmates]." "I already figured I'm going to get hurt. I'm going to get hurt real bad." Before entering Trinidad's cell, deputies shot into the cell ten or more balls filled with pepper spray. Deputies then shot into the cell with a block gun. One of the bullets from the block gun broke Trinidad's right hand; one hit him directly in the chest; and one ricocheted and hit him in the shoulder. Deputies then threw a concussion grenade into the cell. Before deputies entered his cell, Trinidad heard a female deputy say, "Well, get that mother fucker." When the deputies entered the cell, Trinidad lay face down on his mattress, trying to protect himself by "hid[ing] my face in between the floor and the table." Deputies "ran in and they start beating me. One jumped on my back and the other one just started hitting me, and they start tasing me." "[O]ne was trying to break my ankle." Approximately five deputies were on top of Trinidad. One deputy was twisting his already-broken right hand and tasing him. Another deputy "was twisting my ankles." "They told me to stop resisting . . . . I was not [resisting] because one deputy . . . had my right hand and he's twisting. . . . I can't resist." Trinidad heard a deputy say, "The battery's going dead. Give me another taser." After Trinidad was handcuffed, deputies continued to beat and tase

him. He faded in and out of consciousness throughout the extraction. On a scale of one to ten, Trinidad rated the pain from the taser a ten. Trinidad's back was broken in several places. He was transported to the hospital in a neck brace, where he was treated for head, hand, and back injuries.

Appellee Heriberto Rodriguez testified that when deputies came to his cell, he was sitting on his toilet holding his mattress in front of him for protection. Deputies used a block gun to fire four shots, hitting his ankles. They then threw a concussion grenade into the cell. When deputies came into the cell, they yanked the mattress away and hit Rodriguez twice in the face. Rodriguez wears glasses. He put his hands to his face and dropped to the floor. When Rodriguez was face down on the cell floor, someone was hitting his head. A deputy pulled his hand away from his face and twisted his arm. "He was trying to snap it like a broomstick. . . . [H]e was saying things like, 'You mother fucker. You mother fucker.'" "I was watching my elbow bending in an awkward position. I've never seen it bend that way." At the time of trial, four years later, Rodriguez's elbow would not extend to a straight and locked position. Deputies handcuffed Rodriguez and continued to beat him. "Someone dropped a knee or a leg or something on my back. I was still being hit on the back of my head." He was told to "stop fighting," even though he was already handcuffed and was not struggling. Rodriguez was tased repeatedly, "in my armpits, my fingertips, the back of my neck . . . . I was tasered my legs [*sic*], and the bottom of my feet." Rodriguez testified further, "I was laying down cuffed, and I felt something probing my anus. And [the taser] pushed, it pushed, and it went down, and then it pushed, and then it was just a jolt." It went to "the part between the testicles and the anus[.]" On a scale of 1 to 100, Rodriguez rated his pain from the taser a 100.

### 2. Missing Videotapes

LASD policy required staff to videotape cell extractions in their entirety and to preserve the videotapes afterwards. During discovery in this case, appellants produced forty-one videotapes of the cell extractions. These videotapes show almost none of the activity that took place inside the cells. Expert witness Steve Martin reviewed all of the videotapes produced by appellants, looking for the "hard-impact strikes" described by appellants in their post-extraction reports and by appellees. "Remarkably," Martin testified, the videotapes showed "not a single [hard-impact] strike[.]" "[N]ot a single one of those hundred-plus strikes was captured [on video." On the audio of many of the videotapes, deputies can be heard saying "stop fighting." However, none of the videotapes that were produced in discovery shows the inmates at the time this is being said, making it impossible to see whether the inmates were, in fact, fighting.

Appellees' evidence at trial showed that deputies took at least five videotapes of cell extractions that were not produced in discovery. Appellees' evidence showed that those videotapes were taken in a manner that would likely have shown the actual beatings and tasing of the inmates. For example, one of the videotapes that was produced was taken during the extraction of appellee Nunez. The videotape shows another deputy videotaping Nunez's extraction from a vantage point that would likely have shown him being beaten and tased, and that would likely have shown whether he was fighting or resisting at the time. That videotape was not produced by appellants.

At trial, appellants denied "intentionally destroy[ing], misplac[ing], or eras[ing]" the missing videotapes. But

appellants provided no explanation for why those videotapes, and only those videotapes, were missing.

## B. Procedural History

Appellees brought suit against twenty-eight individual defendants and the County of Los Angeles under 42 U.S.C. § 1983 and California Civil Code § 52.1. Appellees Flores, Sanchez, Nunez, and Trinidad contended that the cell extractions violated their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. Appellee Rodriguez, who at the time of the cell extraction was a pre-trial detainee, brought suit under the Due Process Clause of the Fourteenth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

### 1. Jury Instructions

The same jury instructions were used for all five appellees, and the parties do not distinguish among them on appeal. After the trial in this case, the Supreme Court clarified that "the appropriate standard for a pretrial detainee's excessive force claim [under the Fourteenth Amendment] is solely an objective one." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). In contrast, a convicted prisoner's excessive force claim under the Eighth Amendment requires a subjective inquiry into "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The jury instructions for appellee Rodriguez's Fourteenth Amendment claim erroneously required him, as a pretrial detainee, to prove both the objective unreasonableness of the appellants' force (that "defendants used excessive and unnecessary force

under all of the circumstances") and appellants' subjective intent (that "defendants acted maliciously and sadistically for the purpose of causing harm"). Because Rodriguez did not argue that this instruction was erroneous, the argument is forfeited. *See Castro*, 833 F.3d at 1071–72. In any event, the error was harmless because Rodriguez prevailed at trial despite having to prove the additional subjective element. *Cf. Kingsley*, 135 S. Ct. at 2477; *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002) (explaining that the Eighth Amendment's subjective inquiry involves a "heightened standard" that "necessarily involves a more culpable mental state than that required for excessive force claims arising under the Fourth Amendment's unreasonable seizures restriction").

### 2. Interlocutory Appeal and *Chuman* motion

Prior to trial, appellants moved for summary judgment based on qualified immunity. The district court denied the motions. The extraction team supervisors, the "taser deputies," and some of the "shield" and "capture deputies" filed an interlocutory appeal from the denial, arguing that they were entitled to qualified immunity even assuming the facts in the light most favorable to the appellees. We issued an order to show cause why the appeal should not be dismissed under *Johnson v. Jones*, 515 U.S. 304, 307 (1995).

While the interlocutory appeal was pending in our court, appellees moved in the district court to certify the interlocutory appeal as frivolous under *Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992). The district court concluded that it lacked jurisdiction to decide the *Chuman* motion during the pendency of the appeal, and denied the motion on that ground. Then, while the appeal was still

pending and over appellants' objection, the district court ordered that the case proceed to trial on all claims against all defendants. Appellants filed an emergency motion for a stay in our court, which we denied. The case then went to trial.

### 3. Jury Selection

During and immediately following jury selection, appellants contended that Juror Number 5 ("S.M.") was impliedly biased and should be excused for cause. During voir dire, S.M. stated that his mother was a law professor. He stated further that he had family and personal friends who were engaged in activities related to challenging conditions in Los Angeles County jails or who had had negative experiences with law enforcement. One of his friends was general counsel to the Citizens' Commission on Jail Violence ("CCJV") formed by the Los Angeles County Board of Supervisors. He described the friend only as the "head of the Los Angeles Police Commission." A CCJV report was later introduced at trial to support *Monell* liability. There is no evidence that S.M. was aware during voir dire of any connection between his friend and the CCJV report that would be used at trial. S.M. later testified that he had not known that the friend was involved in the CCJV, and that he had not spoken with the friend about "any jail-related commissions." S.M. was also a friend of an exoneree whom appellees' counsel's firm represented. At voir dire, S.M. told the court that he was not sure whether that friend was pursuing a civil case and, if so, who was representing the friend. S.M. also told the court he thought his mother was a friend of appellees' counsel. Appellees' counsel informed the court that he had at most a professional relationship with S.M.'s mother. Appellees had already used all of their

peremptory challenges. Their counsel moved to excuse S.M. for cause. The court denied the motion.

The next day, after he had been seated on the jury, S.M. submitted a note to the judge stating that his father was currently vice-president of the ACLU Foundation of Southern California and had previously served as president. S.M. explained that he had forgotten the connection during voir dire because his father's "primary work" was in entertainment law, and because his father spent comparatively little time doing pro bono work for the ACLU Foundation. In response to questioning, S.M. stated that he and his family members had discussed "issues of jail inmates" during the previous six months and that he and his family members agreed that prisoners "certainly need[] protection of their civil rights and constitutional rights . . . despite the fact they are incarcerated." S.M. stated, however, that he was not sure whether any of these discussions concerned abuses on the part of LASD, and stated that his father had not talked to him about litigation related to prisoners' rights. Appellants again moved to excuse S.M. for cause. The court again denied the motion. S.M. became the jury foreperson.

Later, near the time that the case was submitted to the jury, S.M.'s mother wrote an op-ed in the *Los Angeles Times* advocating for civilian oversight of LASD, in part because of the conditions in the county jails. Appellants again moved to remove S.M. from the jury. The court denied the motion.

### 4. Trial

With respect to individual liability, appellees' testimony at trial is summarized above. Non-party inmates testified to having been subjected to similar treatment during their cell

extractions.  Appellants testified that their use of force was justified under the circumstances, given the violent behavior of appellees and their fellow inmates prior to the extractions as well as the risks involved in extracting high security inmates.

With respect to county liability, appellees presented evidence that the county had a custom or policy of ignoring excessive force used by jail officials, thereby creating a jail culture that proximately caused the beatings and tasing to which appellees were subjected.  Appellees submitted the report, mentioned above, by the CCJV.  The CCJV report concluded, with respect to the Men's Central Jail, that "senior management failed to investigate the excessive use of force problems" at the jail; that "[s]everal key department leaders ignored deputy aggression and discouraged discipline" at the jail; and that senior jail officials had not taken steps to investigate approximately one hundred use-of-force allegations.   The report recounted Department-wide deficiencies in practices and policies governing use of force, excessive force investigations, and discipline for using excessive force.   Appellees presented testimony from appellant Cruz's former supervisor, Commander Robert Olmsted.  Olmsted testified that he had investigated use-of-force incidents at the jail and had found a major increase in such incidents during Cruz's tenure.   Olmstead's investigation uncovered problems in investigating and reporting use-of-force incidents, and in approval of uses of force.  Olmstead concluded that Cruz had "condone[d]" his deputies' excessive force by investigating force incidents improperly or not at all.  Appellees also presented evidence that dozens of use-of-force incidents were omitted from the LASD reporting system, including all of the use-of-force incidents at issue in this case.

After a month-long trial, the jury returned verdicts against nineteen LASD officers and the County of Los Angeles. The jury awarded $740,000 in compensatory damages and $210,000 in punitive damages.

Appellants moved for judgment as a matter of law, for a new trial, and to vacate the judgment and punitive damages award. The district court denied the motions and entered judgment in the amounts awarded by the jury. It also awarded appellees $5,378,174.66 in attorney's fees. This appeal followed.

## II. Discussion

### A.  Lack of *Chuman* Certification

Appellants contend that the district court lacked jurisdiction to go to trial while the interlocutory appeal was pending in our court, and they ask us therefore to vacate the final judgment resulting from this trial. We review de novo the existence of the district court's jurisdiction and review for clear error any underlying factual determinations. *U.S. ex rel. Lindenthal v. Gen. Dynamics Corp.*, 61 F.3d 1402, 1407 (9th Cir. 1995).

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982). The "divestiture of jurisdiction rule is not based upon statutory provisions or the rules of civil or criminal procedure. Instead, it is a judge made rule originally devised in the context of civil appeals to avoid confusion or waste of

time resulting from having the same issues before two courts at the same time." *United States v. Claiborne*, 727 F.2d 842, 850 (9th Cir. 1984). Though *Griggs* referred to the "divestiture rule" as jurisdictional, the Supreme Court has since made clear that "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." *Hamer v. Neighborhood Hous. Services of Chicago*, 138 S. Ct. 13, 17 (2017) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004)). Accordingly, "jurisdictional" rules derived from sources other than Congress are more accurately characterized as "mandatory claim-processing rules" that may be applied in a "less stern" manner than true jurisdictional rules. *Id.* Consistent with this Supreme Court guidance, we have created an exception to the "divestiture rule." Recognizing the importance of avoiding uncertainty and waste, but concerned that the appeals process might be abused to run up an adversary's costs or to delay trial, we have authorized the district court to go forward in appropriate cases by certifying that an appeal is frivolous or waived. *See, e.g.*, *Chuman*, 960 F.2d at 105 (qualified immunity); *United States v. LaMere*, 951 F.2d 1106, 1109 (9th Cir. 1991) (double jeopardy); Claiborne, 727 F.2d at 851 (separation of powers). "In the absence of such certification," however, "the district court is automatically divested" of its authority "to proceed with trial pending appeal." *Chuman*, 960 F.2d at 105.

Unlike defects in constitutional or statutory jurisdiction, which deprive a court of the power to act and thus void actions taken while jurisdiction was lacking, *see, e.g.*, *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76–77 (1988), an error in following our circuit's divestiture procedure does not entirely eliminate the authority of the district court to hear a case. We have "decline[d] to apply the divestiture rule in a slavish manner that ignores the

reality of what happened in the trial court." *United States v. Hickey*, 580 F.3d 922, 927 (9th Cir. 2009). Under this pragmatic approach, we have in other contexts applied harmless error analysis to district courts' errors in following our divestiture procedures. *Hickey*, 580 F.3d at 927 (finding error harmless where "Hickey's interlocutory appeal was ultimately a losing one"); *Claiborne*, 727 F.2d at 851 (finding that the district court erred in finding the appeal frivolous and proceeding with the case, but noting that there would be little point in forcing the district court to repeat actions taken in the interim). Because this logic applies equally to qualified immunity appeals, we conclude that the actions taken in the district court in violation of *Chuman* require reversal only if the error was prejudicial.

We do not ignore the significance of the error of proceeding to trial in this case while the interlocutory appeal was pending. *Cf. Hickey*, 580 F.3d at 927 (admonishing district courts that divestiture errors can waste tremendous time and resources, particularly where a case goes to trial); *Claiborne*, 727 F.2d at 850–51 (noting that proceeding to trial before an appellate court has ruled can cause a litigant irreparable harm). Unlike in *Hickey* and *Claiborne*, where the district court had conducted only pre-trial proceedings during the relevant time period, *see Hickey*, 580 F.3d at 927; *Claiborne*, 727 F.2d at 851, the district court in this case went to trial. We nonetheless conclude that the error was harmless here as well.

We begin with the premise that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at

319–20. We may exercise jurisdiction over issues that do not require resolution of factual disputes, including in cases where officers argue that they have qualified immunity, assuming the facts most favorable to the plaintiff. *See, e.g.*, *George v. Morris*, 736 F.3d 829, 833–34, 836 (9th Cir. 2013); *Johnson v. Cty. of L.A.*, 340 F.3d 787, 791 n.1 (9th Cir. 2003) ("[W]e have jurisdiction . . . even when the determination of qualified immunity depends upon disputed issues of material fact so long as we assume the version of the material facts asserted by the non-moving party to be correct.") (internal quotations and citations omitted).

Here, during the pendency of the qualified immunity appeal, we issued a show cause order inviting appellants to identify the issues, if any, over which we had jurisdiction. Appellants' response failed to identify issues over which we would have had jurisdiction. Instead, appellants either relied on disputed facts or made conclusory assertions insufficient to show that they had a colorable claim to qualified immunity even if all inferences were drawn in appellees' favor. For example, appellants Blasnek and Cruz argued that they "did not participate in any of Plaintiffs' cell extractions and *played no part in the manner in which their extractions were carried out*." (Emphasis added.) Appellees, however, presented evidence (and ultimately proved) that Cruz and Blasnek did play a part in the manner in which the extractions were carried out, both by directly observing the extractions and choosing not to intervene and by creating a jail culture in which uses of excessive force went unpunished.

Appellants thus failed to show cause why we should not have dismissed the interlocutory appeal of the immunity ruling by the district court for lack of jurisdiction, though the trial started before we issued a ruling to that effect. Though

we initially concluded that the jurisdictional issue was not suitable for summary disposition, further review reveals that appellants' interlocutory appeal was frivolous. It is thus clear that the district court's error was harmless.

## B. Exhaustion of Administrative Remedies

Appellants further contend that appellees failed to exhaust administrative remedies at the Men's Central Jail. Under the Prison Litigation Reform Act ("PLRA"), a pretrial detainee or convicted prisoner may not file suit challenging conditions in a correctional facility unless he or she has exhausted administrative remedies at the facility. 42 U.S.C. § 1997e(a); *see also Kingsley*, 135 S. Ct. at 2476 (noting that the PLRA "applies to both pretrial detainees and convicted prisoners"). However, a prisoner is excused from the exhaustion requirement in circumstances where administrative remedies are effectively unavailable, including circumstances in which a prisoner has reason to fear retaliation for reporting an incident. *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015). In order for a fear of retaliation to excuse the PLRA's exhaustion requirement, the prisoner must show that (1) "he actually believed prison officials would retaliate against him if he filed a grievance"; and (2) "a reasonable prisoner of ordinary firmness would have believed that the prison official's action communicated a threat not to use the prison's grievance procedure and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance." *Id.* The district court found that administrative remedies were effectively unavailable to appellees because they "reasonably believed that they would suffer additional physical force if they complained."

Pursuant to our then-existing precedent, the district court considered the appellants' PLRA exhaustion argument on an unenumerated motion to dismiss, but only after requiring appellees to submit evidence "as to why they did not comply with the [applicable] administrative remedy scheme." In our subsequent en banc decision in *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014) (en banc), we clarified that a fact-based failure-to-exhaust defense should be asserted in a summary judgment motion. But where, as here, "it is clear that the district court considered evidence submitted by the parties in reaching its decision, we construe the district court's order as a grant of summary judgment on the issue of exhaustion." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).

We agree with the district court.

Appellees submitted declarations in the district court describing the reasons they feared retaliation for filing grievances arising out of the cell extractions. All appellees emphasized the extreme brutality with which they were beaten and tased. *See Kaba v. Stepp*, 458 F.3d 678, 685 (7th Cir. 2006) (holding that where a prisoner had been denied grievance forms, threatened with retaliation by multiple prison officials, including a captain and the warden, and eventually attacked in his cell, "[t]he attack itself may have transformed the remedies from available to unavailable, for an ordinary prisoner in Kaba's shoes."). Each of them then gave reasons why they individually feared retaliation if they filed grievances.

Appellee Flores filed a declaration recounting that he had turned in a complaint to a nurse at the jail medical ward. The same day, a sergeant came to his cell to deliver a warning.

She alluded to appellee Nunez, whom deputies had earlier released into the exercise yard with rival gang members. Nunez had been badly beaten and assaulted with razor blades. The sergeant warned, "[T]hat's how rats are treated when they lie about my deputies." The sergeant also claimed that she had the power to have him charged with another crime. She concluded, "[F]or your own good, I'm going to forget you turned in this complaint. Keep your mouth shut."

Appellee Sanchez filed a declaration recounting that a deputy had threatened him as he rode in an ambulance to the hospital after the cell extraction. The deputy warned him "not to say shit" about the beatings, threatening that he would be "dealt with" on his return to jail if he talked.

Appellee Nunez filed a declaration recounting that he was housed in a unit where it was impossible to obtain a complaint form without requesting it from a deputy who had been involved in the cell extractions or who was a colleague of such a deputy. Nunez stated that deputies not involved in the cell extractions had told him he was "lucky" that they had not been on duty, implying that they would have beaten him even more severely. He also stated that appellee Flores had told him about the sergeant's threatening visit, during which she had referred to the earlier deputy-instigated violence against Nunez.

Appellee Trinidad filed a declaration recounting that he, like Nunez, was housed in a unit where it was impossible to obtain a complaint form without requesting it from a deputy who had been involved in the cell extractions or who was a colleague of such a deputy. Trinidad stated that he knew from his personal experience that other inmates had been beaten for filing grievances and that he had heard that anyone

who complained about the beating that occurred during the cell extractions would face retaliation.

Appellee Rodriguez filed a declaration recounting that he was housed on the third floor of the jail, where some of the beatings and tasings had taken place. He stated that guards on that floor had developed a "gang-like culture" that included intimidation and retaliation for filing grievances. He submitted an article published in the *Los Angeles Times* reporting that the LASD had initiated termination proceedings against six third-floor deputies, who were part of what officials had described as an "aggressive group," and a "clique" with "certain gang-like characteristics." Using public records, the *Times* had confirmed that third-floor deputies had been involved in many more use-of-force incidents against prisoners than deputies on other floors.

Because appellants demonstrated that appellees had failed to use available remedies, the appellees were required to produce evidence that "there [was] something in [their] particular case that made the existing and generally available administrative remedies effectively unavailable." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). If the appellees in this case had alleged only general and unsubstantiated fears about possible retaliation, as appellants claim, we would hold that they had not exhausted their administrative remedies. *See McBride*, 807 F.3d at 987–88. The record reflects, however, that the appellees provided factual statements supporting an actual and objectively reasonable fear of retaliation for filing grievances. Accordingly, the ultimate burden of proof remained with the appellants to show that administrative remedies were available. *See Albino*, 747 F.3d at 1172. The district court did not clearly err in finding that a reasonable fear of

retaliation made the grievance system effectively unavailable for appellees, and that appellants did not carry their burden of proof. *See id.* at 1171 (factual findings reviewed for clear error).

### C.  Immunity under Federal and State Law

### 1.  Qualified Immunity under Federal Law

Qualified immunity under federal law protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017).

Appellants have challenged the district court's denial of qualified immunity on two grounds.  First, in their motions for summary judgment, appellants invoked qualified immunity based on the record then before the district court. Those motions are now moot. *See Ortiz v. Jordan*, 562 U.S.

180, 183–84 (2011); *Padgett v. Wright*, 587 F.3d 983, 985 (9th Cir. 2009) (per curiam).

Second, appellants argue that the district court erred in denying their Rule 50(b) motion, based on qualified immunity, for judgment as a matter of law. Because the jury found for appellees on their excessive force claims, we "construe the trial evidence in the light most favorable to [appellees] in determining whether [their] rights were clearly established." *Morales v. Fry*, 873 F.3d 817, 826 (9th Cir. 2017). "Further, unlike a motion to dismiss or motion for summary judgment, we must defer to the facts as they were reasonably found by the jury . . . ." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 459 (9th Cir. 2013). We accept the jury's findings of fact, "including the [appellants'] subjective intent," unless the appellants demonstrate that those findings were unsupported by the evidence. *Id.* at 458–59. But while "only the jury can decide the disputed factual issues, . . . only the judge can decide whether the right was clearly established once the factual issues are resolved." *Morales*, 873 F.3d at 823.

An Eighth Amendment claim of excessive force "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Hudson*, 503 U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). Accordingly, the jury here was instructed that it had to find that (1) appellants "used excessive and unnecessary force under all of the circumstances"; (2) appellants "acted maliciously and sadistically for the purpose of causing harm"; and (3) "the acts of the [appellants] caused harm to the [appellees]." As we explained above, Rodriguez has forfeited any argument

that his claim should have been analyzed under the more lenient, purely objective, due process standard.

Appellants argue that their use of force was justified by the appellees' resistance. In effect, they attack the jury's finding that they violated the Eighth Amendment by acting "maliciously and sadistically." This argument is meritless. As noted above, there was abundant evidence presented to the jury that appellants inflicted severe injuries on appellees while they were not resisting, and even while they were unconscious. A jury could reasonably reject appellants' argument that they acted reasonably and instead determine that this force was not part of a "good-faith effort to maintain or restore discipline," *Hudson*, 503 U.S. at 7. We therefore reject appellants' sufficiency of the evidence challenge to the jury's finding of a constitutional violation.

Appellants also argue that the law regarding their conduct was not clearly established. Though we do "not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). "[T]he focus is on whether the officer had fair notice that [the officer's] conduct was unlawful." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Though we defer to the jury's reasonable view of the facts, "the 'clearly established' inquiry is a question of law that only a judge can decide." *Morales*, 873 F.3d at 821.

Appellants offer a variety of arguments, based on their respective roles in the incident, that the law regarding their conduct was not clearly established. None is persuasive.

### a. Deputies

The deputy appellants—Deputies Alonso, Bravo, Frazier, Graham, Orlandos, Thomas, Guzman, Lyons, Esqueda, Sanford, Vazquez, and Delgado—argue that the law was not clearly established as to their use of force during the cell extractions.

We have recognized that *Hudson*'s "good-faith effort to maintain or restore discipline" standard, 503 U.S. at 6, sets forth the clearly established law regarding an Eighth Amendment excessive force violation "in the context of quelling a prison disturbance," *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). Appellants offer only a conclusory statement that the law was not clearly established as to the appropriate use of force within the context of a prison disturbance. Accepting the jury's finding of appellants' malicious and sadistic intent, *see Morales*, 873 F.3d at 823, and construing the record in the light most favorable to the appellees, we disagree.

Analogous Supreme Court and circuit cases decided well before 2008 gave these deputies notice that the malicious and sadistic use of force in responding to a prison disturbance violated the Eighth Amendment. *See, e.g.*, *Hudson*, 504 U.S. at 4 (holding that officers violated the Eighth Amendment where one officer "punched Hudson in the mouth, eyes, chest, and stomach while [another officer] held the inmate in place and kicked and punched him from behind"). In *Martinez*, for instance, the plaintiff claimed that he had covered his cell door with a bed sheet in order to prevent pepper spray fumes from entering the cell during a prison disturbance. 323 F.3d at 1180. Under the plaintiff's version of events, "after he told the officers the sheet would be removed when the fumes were

gone, the officers fired two plastic bullets from a gas gun and one taser cartridge into the cell," with one bullet striking him. *Id.* "Once the officers entered the cell, they pushed him into a seated position, and tasered him twice on his left arm, despite his lack of resistance." *Id.* Officers continued striking the plaintiff while he was restrained and eventually dragged him out of the cell. *Id.* We concluded that, viewing the facts in the light most favorable to the plaintiff, the plaintiff had alleged sufficient facts to show an Eighth Amendment violation and that the officers had violated clearly established law. *Id.* at 1183–85.

Given these precedents, no reasonable officer in appellants' positions would have believed that beating a prisoner to the point of serious injury, unconsciousness, or hospitalization solely to cause him pain was constitutionally permissible.

### b.  Deputies Using Tasers

As we have just explained, existing precedent was sufficient to place beyond debate the question whether the use of more than *de minimis* force "maliciously and sadistically for the purpose of causing harm" violated the Eighth Amendment under the circumstances here. The deputies who used tasers—Deputies Sanford, Vazquez, and Delgado— nonetheless contend that they are entitled to qualified immunity because the law governing the use of tasers was not clearly established in 2008. We disagree.

"An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994). This statement applies

with particular strength in the context of the Eighth Amendment. A plaintiff cannot prove an Eighth Amendment violation without showing that force was employed "maliciously and sadistically" for the purpose of causing harm. *See Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.)).

Even if particularized notice, specific to tasers, were needed at the time Deputies Sanford, Vazquez, and Delgado acted, *see Mendoza*, 27 F.3d at 1362, controlling circuit and Supreme Court case law provided it. We observed in 1988 that the taser is a "painful and dangerous device" and that "[a] legitimate prison policy of carrying tasers to enforce discipline and security would not warrant their use when unnecessary or 'for the sole purpose of punishment or the infliction of pain.' " *Michenfelder v. Sumner*, 860 F.2d 328, 336 (9th Cir. 1988) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984), and *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979)); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (holding that, as of May 2008, it was clearly established that taser shocks constituted "non-trivial force" for Fourth Amendment purposes); *Lewis v. Downey*, 581 F.3d 467, 478–79 (7th Cir. 2009) (holding that it was clearly unconstitutional in 2006 to tase prisoners maliciously and sadistically in the circumstances alleged); *Orem v. Rephann*, 523 F.3d 442, 448–49 (4th Cir. 2008) (holding that malicious and sadistic use of a taser on a pretrial detainee's breast and inner thigh was not *de minimus* force and was clearly unconstitutional in 2005), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) (holding that using "stun guns" on nonviolent prisoners violates the Eighth Amendment). The Supreme Court has long disapproved of

the use of electric shocks purely to inflict pain, beginning with its denunciation of the famous "Tucker telephone," a device that, like the tasers in this case, was "used to administer electrical shocks to various sensitive parts of an inmate's body." *Hutto v. Finney*, 437 U.S. 678, 682 & n.5 (1978); *see also Hudson*, 503 U.S. at 14 (1992) (Blackmun, J., concurring) (suggesting that an electric shock inflicted as punishment would violate the Constitution); *id.* at 26 (Thomas, J., dissenting) (same).

Deputies Sanford, Vazquez, and Delgado argue that limits on the proper use of tasers were still unclear as of 2008, relying on two Fourth Amendment cases decided after the cell extractions at issue in this case: *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc), and *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010). *Mattos* and *Bryan* clarified the circumstances under which taser use would violate the Fourth Amendment and granted qualified immunity to the officers who acted without the benefit of this clarification. *See Mattos*, 661 F.3d at 448; *Bryan*, 630 F.3d at 833.

However, the deputies' argument fails to acknowledge the respective standards for Fourth and Eighth Amendment violations. *Graham v. Connor*, 490 U.S. 386, 397–98 (1989); *Whitley*, 475 U.S. at 319. We determine whether the Fourth Amendment has been violated by assessing the objective reasonableness of the force used, balancing the degree of intrusion against the government's interest. *Gravelet-Blondin*, 728 F.3d at 1090. "Subjective intentions play no role in ordinary . . . Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Graham*, 490 U.S. at 399. By contrast, subjective intent is critical in an Eighth Amendment analysis. More than *de minimis* force applied for

no good faith law enforcement purpose violates the Eighth Amendment. *See Whitley*, 475 U.S. at 320–21 (1986) (holding that whether an officer used excessive force in violation of the Eighth Amendment "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " (quoting *Johnson*, 481 F.2d at 1033)). Objective reasonableness may inform the Eighth Amendment inquiry, providing evidence of good faith or of malice. *Hudson*, 503 U.S. at 7. But once a jury has determined on the basis of sufficient evidence that "prison officials maliciously and sadistically use[d] [more than *de minimis*] force to cause harm, contemporary standards of decency," and thus the Eighth Amendment, "always are violated." *Id.* at 9. Here, the evidence amply supported the jury's finding that the deputies acted maliciously and sadistically.

### c. Supervisors

The supervisor appellants—the sergeants who directed the extraction teams (Sergeants McGratten, Ohnemus, and Washington) and their superiors (Captain Cruz and Lieutenant Blasnek)—argue that they are entitled to qualified immunity. They contend that they did not violate clearly established law because their actions were justified by the nature of the pre-extraction disturbance and the appellees' resistance. As explained above, the deputies' actions violated clearly established law. The question specific to the supervisors is whether they are individually liable for those constitutional violations under principles of supervisory liability. We conclude that they are.

A supervisory official is liable under § 1983 so long as "there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). "The requisite causal connection can be established . . . by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (internal quotation marks and citations omitted) (alterations in original). Thus, a supervisor may "be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Keates*, 883 F.3d at 1243 (quoting *Starr*, 652 F.3d at 1208).

Sergeants McGrattan, Ohnemus, and Washington concede that they were personally present and directed the deputies' use of force against appellees. Even assuming that their presence and direction of the extraction teams does not constitute "personal involvement," there is a "sufficient causal connection" to establish the sergeants' supervisory liability for their "own culpable action or inaction in the . . . supervision [and] control of" the deputies. *Keates*, 883 F.3d at 1242–43 (citation omitted).

We do not accept appellants' argument that the nature of the pre-extraction disturbance, standing alone, justified the supervisors' inaction. Long before the incident in question, the Supreme Court established that government officials

violate the Eighth Amendment when they use malicious and sadistic force in the course of quelling a prison disturbance, even one that "indisputably poses significant risks to the safety of inmates and prison staff." *See Whitley*, 475 U.S. at 320–21.

To the extent that appellants Cruz and Blasnek stood by and observed the extractions but "knowingly refus[ed] to terminate" the deputies' unconstitutional acts, *Starr*, 652 F.3d at 1207 (citation omitted), they are individually liable for the same reasons as Sergeants McGrattan, Ohnemus, and Washington. Ample evidence—including appellants' own testimony—supports the conclusion that appellants Cruz and Blasnek directed and observed most of the extraction teams. For example, there was evidence that appellant Blasnek "observe[d] each extraction." Appellant Cruz was shown on video observing Trinidad's, Sanchez's, and Flores's extractions.

It is not clear from the record before us that appellant Cruz directly observed Nunez's and Rodriguez's extractions. Assuming without deciding that Cruz did not observe these extractions, the jury could still have reasonably found the "requisite causal connection" to hold Cruz liable for his "own culpable action or inaction in the training, supervision, or control of his subordinates." *Starr*, 652 F.3d at 1207–08 (citations omitted). The jury could have concluded from evidence in the record, including Olmstead's testimony, that Cruz knowingly participated in creating and maintaining a culture of impunity for officers' use of unconstitutionally excessive force, thereby "setting in motion a series of acts by" his subordinates that Cruz "knew or reasonably should have known would cause" the violations of appellees' Eighth Amendment rights. *Id.* (citations omitted). The jury could

also reasonably have concluded that in disabling or failing to follow procedures used to identify uses of excessive force, and in ensuring that violators escaped punishment, Cruz created an environment where the mechanisms for supervision and control over the use of force operated ineffectively and sometimes not at all.  Thus, the jury could also reasonably conclude that Cruz's "inaction in the training, supervision, or control of his subordinates" provided a basis for supervisory liability.  *Id.* at 1208 (citation omitted).

## 2.  Immunity under State Law

Finally, the supervisors argue that they have immunity under state law.  They argue that they cannot be held liable under California Civil Code § 52.1 because California Civil Code § 820.2 shields them from liability for discretionary acts and California Civil Code § 820.8 renders them immune from vicarious liability.  We disagree.  First, § 820.2 does not shield from liability government employees who use excessive force in carrying out their duties.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007).  Second, § 820.8 is inapplicable because, as just explained, appellees do not rely on vicarious liability, but, rather, rely on the supervisors' culpable action or inaction that proximately caused their injuries.

## D.  California Civil Code § 52.1

The district court entered judgment in favor of appellees Flores, Nunez, Sanchez and Trinidad under the Bane Act, California Civil Code § 52.1, on their cruel and unusual punishment claims under the Eighth Amendment.  (As noted above, *supra* Section I.B, appellee Rodriguez, a pre-trial detainee, brought a Fourteenth Amendment due process claim

rather than an Eighth Amendment cruel and unusual punishment claim.)  In relevant part, § 52.1 provides a cause of action for interference or attempted interference "by threat, intimidation, or coercion" with the "exercise or enjoyment" of rights under the federal Constitution.  Appellants argue that § 52.1 required appellees to prove that appellants threatened, intimidated, or coerced appellees in some manner beyond the coercion inherent in the Eighth Amendment excessive force violation.  In advancing this argument, appellants misread § 52.1 and California case law.

The most recent California Supreme Court case interpreting the Bane Act is *Venegas v. County of Los Angeles* (*Venegas II*), 87 P.3d 1 (Cal. 2004), in which two plaintiffs alleged that sheriff's deputies violated the Act when they searched plaintiffs' home without a warrant and without consent, arrested one of the plaintiffs based on evidence obtained during the warrantless search, and detained the other for two hours.  Plaintiffs did not allege threats, intimidation, or coercion separate from, or in addition to, the conduct that constituted the violations of the Fourth and Fourteenth Amendments. *See id.* at 3–4.  Without extended analysis, the California Supreme Court held that "plaintiffs adequately stated a cause of action under Section 52.1." *Id.* at 14.  The Court's holding in *Venegas II* had been prefigured in *Jones v. Kmart Corp.*, 949 P.2d 941 (Cal. 1998), in which KMart employees pursued, seized, struggled with, and handcuffed Jones, a suspected shoplifter.  The California Supreme Court held that no cause of action had been stated under § 52.1 because the KMart employees were not state actors. *Id.* at 943–44.  But the Court noted that Jones's rights under § 52.1 might have been "put in jeopardy . . . if [the] defendants had called the police and then coercively interfered with Jones's Fourth Amendment rights when he attempted to exercise

them *against the police.*" *Id.* at 944 (emphasis added). In neither *Venegas II* nor *Jones* did the California Supreme Court hold that § 52.1 requires threats, intimidation, or coercion beyond that inherent in the constitutional violation itself.

Appellants rely on two California Court of Appeal cases decided after *Venegas II*—*Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947 (2012), and *Allen v. City of Sacramento*, 234 Cal. App. 4th 41 (2015)—to support their argument that § 52.1 requires threats, intimidation, or coercion beyond that inherent in the underlying constitutional violation. Neither case supports their argument, as is shown by two more California Court of Appeal cases—*Bender v. County of Los Angeles*, 217 Cal. App. 4th 968 (2013), and *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017).

In *Shoyoye*, because of a negligent clerical error, the plaintiff was held in the county jail for about sixteen days beyond the date he should have been released. 203 Cal. App. 4th at 951–53. The Court of Appeal held that the negligent act did not give rise to a cause of action under § 52.1. *Id.* at 959. It distinguished *Venegas II*:

> The coercion [in holding Shoyoye in jail for sixteen days beyond his release date] was not carried out in order to effect a knowing interference with Shoyoye's constitutional rights. This is in stark contrast to *Venegas II*, for example, in which the evidence presented could support a finding that the probable cause that initially existed to justify stopping the plaintiffs eroded at some point, such that

the officers' conduct became intentionally coercive and wrongful, i.e., a knowing and blameworthy interference with the plaintiffs' constitutional rights.

*Id.* at 961.

In *Allen*, police officers arrested homeless people and seized their tents, sleeping bags, tarps, and personal items pursuant to a Sacramento anti-camping ordinance. 234 Cal. App. 4th at 48–51. Relying on *Shoyoye*, the Court of Appeal concluded that no cause of action had been stated under § 52.1, even if the arrest violated the Fourth Amendment. *Id.* at 69. It wrote:

There are two distinct elements for a section 52.1 cause of action. A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion.

. . .

Similar to *Shoyoye*, this case involves an allegedly unlawful arrest but no alleged coercion beyond the coercion inherent in any arrest. . . . Consistent with *Shoyoye*, we conclude a wrongful arrest or detention, without more, does not satisfy both elements of section 52.1.

*Id.* at 67, 69.

*Bender* was decided after *Shoyoye* but before *Allen*. The plaintiff in *Bender* was granted a judgment under § 52.1 after presenting evidence at trial that he had been subjected to excessive force in the course of his arrest. 217 Cal. App. 4th at 972–75. The Court of Appeal affirmed. *Id.* at 981. Because of *Bender*, the Court of Appeal in *Allen* was careful to limit its holding by noting that excessive force had not been alleged. It wrote:

> We begin by noting what plaintiffs do not assert. The first amended complaint does not allege the use of excessive or unreasonable force by the police, and plaintiffs do not contend on appeal that this is an excessive force case.

*Allen*, 234 Cal. App. 4th at 66.

The facts in *Bender* are remarkably similar to the facts in the case before us. Plaintiff Bender was an African-American apartment manager who had questioned two sheriff's deputies when they arrested two African-American tenants of the apartment. *Bender*, 217 Cal. App. 4th at 972. As in the case before us, the defendants in *Bender* were deputies employed by the LASD. *Id.* at 971. The deputies beat the plaintiff until he was unconscious. *Id.* at 973. Most strikingly, deputies yelled "stop fighting" as they were beating Bender even though he was not fighting or resisting. *Id.* at 975.

The Court of Appeal wrote:

> Deputy Chavez ran around the patrol car and he and Deputy Sorrow slammed plaintiff to the ground. Plaintiff was in handcuffs, so

he could not break the fall and went down on his face. Deputies Sorrow and Chavez started "kneeing and kicking and beating him while he was on the ground." Deputy Sorrow was kicking him in the arms and ribs. Plaintiff was kicked in the side eight to 10 times, and "there was what felt like a knee in the back of my neck, pressing my face to the ground. And while I was being held there by the back of my neck, I was being struck on the top, back part of my head." . . .

During the beating, Deputy Sorrow said, "F—ing [N word] lover, you're getting what you deserved." Even though plaintiff at no time attempted to fight or struggle with the deputies, Deputy Sorrow yelled, "Stop fighting." . . . After the beating stopped, plaintiff "thought it was over with, and I opened my eyes and I was sprayed across both of my eyes, and then it was sprayed up to my nostrils and sprayed up my nose. And when I opened my mouth to breath, it was pressed against my lips and sprayed into my mouth." Plaintiff lost consciousness.

*Id.* at 973. The Court of Appeal distinguished *Shoyoye* based on the fact that, unlike in *Shoyoye*, the deputies had used excessive force: "Where, as here, an arrest is unlawful *and* excessive force is applied in making the arrest, there has been coercion 'independent from the coercion inherent in the wrongful detention itself' (*Shoyoye*)—a violation of the Bane Act." *Id.* at 978 (emphasis in the original) (citation omitted);

*see also Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015) (quoting this sentence from *Bender*).

In *Cornell*, the Court of Appeal recently confirmed "that the use of excessive force can be enough to satisfy the [Bane Act's] 'threat, intimidation or coercion' element." 17 Cal. App. 5th at 799. The Court of Appeal explicitly rejected the argument that appellants advance here, explaining that the text of the Bane Act does not require "that the offending 'threat, intimidation or coercion' be 'independent' from the constitutional violation alleged." *Id.* at 800. Rather, the court explained, in the context of an unlawful arrest, "the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* at 801–02.

Finally, this analysis is consistent with our recent decision in *Reese v. County of Sacramento*, where we addressed a Bane Act claim premised on an alleged Fourth Amendment excessive force violation. — F.3d —, 2018 WL 1902416, at *6–7 (9th Cir. Apr. 23, 2018). We rejected a similar argument based on *Shoyoye*, reasoning that *Cornell*'s interpretation of the Bane Act was consistent with the statutory language and the California Supreme Court's decisions. *Id.* at *8–9. We therefore held that "the Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged," but rather a showing of the defendant's specific intent to violate the plaintiff's constitutional rights. *Id.* at *8.

We conclude from these decisions that in excessive force cases, including Eighth Amendment cases, § 52.1 does not

require proof of coercion beyond that inherent in the underlying violation. Because appellees Flores, Nunez, Sanchez and Trinidad provided evidence sufficient to support a finding that they were subjected to excessive force in violation of the Eighth Amendment, they necessarily provided evidence sufficient to support a finding of a violation of their rights under § 52.1.

## E. *Monell* Liability

Appellants argue that appellees' evidence was insufficient to support municipal liability, and that the district court therefore erred in denying appellants' post-trial motion for judgment as a matter of law on appellees' *Monell* claim. We review de novo the district court's denial of judgment as a matter of law. We will uphold the jury's verdict "if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

A local government is liable for an injury under § 1983 under three possible theories. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060. First, a local government may be liable if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Second, a local government can fail to train employees in a manner that amounts to "deliberate indifference" to a constitutional right, such that "the need for more or different training is so

obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Third, a local government may be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gravelet-Blondin*, 728 F.3d at 1097 (internal quotation marks and citation omitted).

We have recognized that a § 1983 plaintiff may prove the second type of *Monell* liability, deliberate indifference, through evidence of a "failure to investigate and discipline employees in the face of widespread constitutional violations." *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). Thus, it is sufficient under our case law to prove a "custom" of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity. *Id.* at 1233 ("We have long recognized that a custom or practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." (internal quotation marks and citations omitted)); *Larez*, 946 F.2d at 647 ("[T]here was evidence of a departmental policy or custom of resorting to the use of excessive force. The jury properly could find such policy or custom from the failure of Gates to take any remedial steps after the violations."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("McRorie alleges that guards seriously injured him and twenty-eight other prisoners during the shakedown and that Sergeant Dunn was acting under orders of his superiors. If proved, these acts reflect a [policy or custom]."); *see also Velazquez v. City of Long Beach*, 793

F.3d 1010, 1027–28 (9th Cir. 2015) (recognizing that a plaintiff could present "a failure-to-discipline *Monell* theory" based on evidence "that the City had a policy or custom of failing to investigate and discipline officers who had allegedly committed prior instances of excessive force").

Appellees presented substantial evidence to show that the LASD had a custom of ignoring or condoning excessive force, and that this custom proximately caused the beatings at issue here.   That evidence included the CCJV report; Olmstead's testimony; evidence that LASD had not used their force-tracking system to monitor force used against many prisoners, including appellees; and evidence that supervisory staff had observed the practices proved at trial but had done nothing.  In declining to grant judgment as a matter of law to appellants on this issue, the district court ruled that the LASD had tolerated excessive force at the jail and had created an atmosphere of wanton violence and impunity.   The court wrote that within the jail itself, "Captain Cruz . . . perpetuated a culture where excessive force was encouraged, openly joked with the deputies about force, and promoted the practice of incomplete and ineffective investigations into deputy misconduct."

The record amply supports the jury's verdict and the district court's ruling.   There was substantial evidence of repeated constitutional violations, of LASD's awareness of those violations, and of LASD's failure to take any remedial action.  Our precedents permitted the jury to infer that LASD had adopted a custom or practice of condoning excessive force and that this culture of violence and impunity proximately caused the injuries inflicted on appellees. *See Hunter*, 652 F.3d at 1233–34.

## F.  Juror Bias

Appellants argue that the district court erred in denying their motions to excuse Juror Number 5 ("S.M.") and later denying a motion for a new trial based on S.M.'s service on the jury.  We disagree.

We review a district court's implied bias determination de novo but review the court's findings of fact and credibility determinations for clear error.  *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007) (en banc); *Riley v. Payne*, 352 F.3d 1313, 1317 (9th Cir. 2003).  We review denial of a motion for a new trial for abuse of discretion.  *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1055 (9th Cir. 1997).

"The Constitution guarantees both criminal and civil litigants a right to an impartial jury."  *Warger v. Shauers*, 135 S. Ct. 521, 528 (2014).  We have held that a juror was "actually biased" where the juror's answers in voir dire indicated that he or she cannot decide the case impartially.  *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000).  In "extraordinary" circumstances, we have also found "implied bias."  *Dyer v. Calderon*, 151 F.3d 970, 981 (9th Cir. 1998) (en banc); *see also Tinsley v. Borg*, 895 F.2d 520, 527–28 (9th Cir. 1990).  Implied bias is found "in those extreme situations 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.' "  *Fields*, 503 F.3d at 770 (quoting *Tinsley*, 895 F.2d at 527).  We have recognized that implied bias can be found "where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he

will," *Tinsley*, 895 F.2d at 528, or "where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury," *Fields*, 503 F.3d at 770 (citing *Dyer*, 151 F.3d at 982).

We have cautioned that courts assessing implied bias "should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." *Id.* at 772 (quoting *Tinsley*, 895 F.2d at 527)). For example, "[w]e will not presume bias merely because a juror works in law enforcement or is a federal government employee." *Tinsley*, 895 F.2d at 529. Otherwise, our doctrine of implied bias would not be limited to "extreme situations," *Fields*, 503 F.3d at 770, but would instead extend to "the summary exclusion for cause of NAACP members from cases seeking the enforcement of civil rights statutes, Moral Majority activists from pornography cases, Catholics from cases involving abortion clinic protests, members of NOW from sex discrimination cases, and subscribers to Consumer Reports from cases involving products liability claims," *Tinsley*, 895 F.2d at 528 (quoting *United States v. Salamone*, 800 F.2d 1216, 1225 (3d Cir. 1986)).

We have found implied bias based on a juror's employment only where it has been accompanied by additional factors. In *United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir. 1977), we held that two jurors were impliedly biased in a bank robbery trial where they worked for a different branch of the bank that had been robbed. We attributed this result to "[t]he employment relationship coupled with a reasonable apprehension of violence by bank robbers." *Id.* In a subsequent en banc opinion, we noted the limits of *Allsup*'s holding, explaining that "[t]he implied bias that we found in Allsup was based on the jurors' direct

relationship with the victim and their own vulnerability to the same type of conduct for which the accused bank robbers were on trial." *Fields*, 503 F.3d at 773. By contrast, in *Tinsley*, we declined to infer bias on the basis of a juror's employment, "even where closely related to the substance of the case." 895 F.2d at 529 (finding no implied bias in a rape case that turned on credibility, even though the juror had professionally counseled a different rape survivor for a year and a half and had testified at trial that that survivor was credible).

We have been similarly hesitant to find implied bias based solely on the experiences of a juror's relatives. Thus, while "we have recognized that bias may be implied where close relatives of a juror 'have been personally involved in a situation involving a similar fact pattern,' we have never done so when the juror was honest on voir dire." *Fields*, 503 F.3d at 773 (internal citations omitted) (quoting *Tinsley*, 895 F.2d at 528).

Here, appellants argue that S.M. was impliedly biased due to a combination of the professional activities of his parents and his personal friendships with other individuals who had some involvement with the prison system.

This record does not require a finding of implied bias. The ACLU affiliation of S.M.'s father does not, standing alone, give rise to an inference of bias. Bias is even less likely here than in *Tinsley*, since S.M. was not himself affiliated with the ACLU. *See United States v. Olano*, 62 F.3d 1180, 1192 (9th Cir. 1995) (holding that juror's daughter-in-law's employment with the company from whom Olano was accused of taking kickbacks did not imply bias); *Salamone*, 800 F.2d at 1226 (absent additional evidence of

bias, "no juror may be excluded for cause on the basis of his or her membership in an organization that adheres to a particular view").

Though the organizations with which S.M.'s family and friends were associated had some remote connections to this particular case, S.M. was not a member in these organizations and was unaware of their involvement in activities tied to this case. The ACLU had only an indirect relationship with the litigation and that relationship does not appear to have been known to S.M. Further, S.M. was unaware that his friend's organization, the CCJV, had prepared a report that would be presented as evidence in the case. Finally, S.M. also made clear that he did not know whether the LASD had committed any of the kinds of abuses that his family opposed.

Nor does the timing of the op-ed article published in the *Los Angeles Times* by S.M.'s mother near the end of the trial require us to find implied bias. S.M.'s mother's publicly expressed opinion on civilian oversight of LASD does not implicate our case law involving "close relatives of a juror [that] 'have been personally involved in a situation, involving a similar fact pattern,' " *Fields*, 503 F.3d at 773 (quoting *Tinsley*, 895 F.2d at 528)), nor does it present a new type of "extreme" situation giving rise to implied bias. An innocent explanation for the article's timing appears in its first two sentences: "It is time to seriously consider a civilian oversight board for the Los Angeles County Sheriff's Department. *The Board of Supervisors is scheduled to consider such a proposal next week*." (Emphasis added.) The remainder of the article is devoted largely to the virtues of civic participation. The article alludes to problems in Los Angeles's jails only in general terms and does not mention

excessive force or the Men's Central Jail. This is not enough to overcome the presumption that S.M. complied with the court's instructions not to talk about the case with others and to avoid reading about subjects related to the case. *See Parker v. Randolph*, 442 U.S. 62, 73 (1979), *abrogated on other grounds by Cruz v. New York*, 481 U.S. 186, 194 (1987).

Finally, appellants contend that S.M. was not candid during voir dire. We held in *Dyer*, 151 F.3d at 982, that a juror's dishonesty supported an inference of bias, but the facts in *Dyer* were radically different from the facts here. In *Dyer*, the juror in question failed to mention that her brother was murdered in the same manner that the defendant was accused of murdering the victim. Further, the juror lied by claiming that she thought her brother's death was an accident and by stating that she did not testify at the trial of her brother's killer. *Id.* at 982. Here, by contrast, there is no evidence that S.M. was dishonest about anything. During his initial voir dire, S.M. failed to mention his father's ACLU connection, but the next day, on his own initiative, he notified the court of the omission. The district court did not err in finding that this initial omission was not evidence of dishonesty that would support a finding of implied bias. Further, the late disclosure did not deprive appellants of the opportunity to exercise a peremptory challenge, for they had used all of their peremptory challenges before S.M.'s initial voir dire began.

## G.  Punitive Damages

Appellants challenge as excessive the jury's award of punitive damages. The total compensatory damages award was $740,000. The total punitive damages award was $210,000, awarded only against the supervisory appellants.

The punitive damages awarded per individual supervisor were: $75,000 against appellant Cruz; $60,000 against appellant Blasnek; $30,000 each against appellants McGratten and Ohnemus; and $15,000 against appellant Washington. All of the punitive damages awards to individual appellees ranged from $10,000 to $15,000, with the exception of one award of $30,000.

Appellants urge us to apply California law that limits punitive damages based on a defendant's net worth. We decline to apply California law here because appellees sought punitive damages for violations of their rights under 42 U.S.C. § 1983 rather than state law. Under federal law, "ability to pay is of some importance" in assessing the propriety of a punitive damages award but it is not dispositive. *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 438 (9th Cir. 1975).

Under the Due Process Clause of the Fourteenth Amendment, the determination whether punitive damages are excessive turns on several factors, including the egregiousness of the conduct, the proportionality between punitive and compensatory damages awards, and the amount of the punitive damages awarded or upheld in similar cases. *See State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). As applied to facts of this case, these factors do not warrant reversal.

Appellees proved egregious, even shocking, abuses of power. Furthermore, the punitive damages awarded to each appellee, considered individually or together, were all far less than appellees' compensatory damages. We have upheld significantly larger per-plaintiff punitive damages awards in other cases. For example, we recently upheld a jury award of

$125,000 in compensatory damages and $165,000 in punitive damages to a single plaintiff, in an excessive force case against the County of Los Angeles, as well as appellant Cruz and several other LASD officials working in a Los Angeles County jail. *Willis v. Vasquez*, 648 F. App'x 720, 724 & n.1 (9th Cir. 2016).

## H.  Trial Errors

Appellants argue that the district court committed several reversible errors during trial.  We are not persuaded.

First, appellants argue that appellees' *Monell* claim against the county should have been tried separately from their claims against the individual defendants.  The district court acted within its "broad discretion" in declining to bifurcate the *Monell* claim.  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (citation omitted).  Though some of the evidence relevant to the *Monell* claims was irrelevant to individual liability, the district court's many limiting instructions cured any possible prejudice.  *See Velazquez*, 793 F.3d at 1028.

Second, appellants argue that the district court should not have excluded evidence of appellees' felony convictions and their gang membership.  The district court permitted appellants' witnesses to testify, consistent with their knowledge, that the prisoners involved in the disturbance held some of the highest security classifications in the prison.  For example, appellants testified that the prisoners were "extremely dangerous," that they were some of the most dangerous prisoners in the county and even the country, that they were the "worst of the worst," and that they were prone to act violently toward other prisoners and staff.  The court

also permitted appellants to present evidence of appellees' violent and disruptive behavior before and during the extraction itself. The court evaluated the additional probative value of the proffered evidence of criminal history and gang membership, and balanced it against prejudice to appellees. It then acted within its discretion in excluding the evidence under Federal Rule of Evidence 403. "The Rule 403 weighing process is primarily for the district court to perform. Trial judges are better able to sense the dynamics of a trial than we can ever be, and broad discretion must be accorded them in balancing probative value against prejudice." *Longenecker v. Gen'l Motors Corp.*, 594 F.2d 1283, 1286 (9th Cir. 1979); *see also United States v. Weiland*, 420 F.3d 1062, 1078 (9th Cir. 2005).

Third, appellants argue that the district court erred in two of its instructions to the jury. One is an instruction in which the court told the jury:

> The defendants have an affirmative duty to video record what occurred during the extractions and to preserve the videos. Certain videos once existed. Now they are missing or they are destroyed. The Court makes a finding to be used for all purposes that defendants violated their own video preservation policy by not maintaining these videos.

Appellants argue that before giving this instruction the district court was required to find that the videotapes had been willfully misplaced or destroyed. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). The district court did make such a finding, which was supported by evidence in

the record.  Further, individual appellants point out that there was no showing that any of them were responsible for the loss or destruction of the videotapes.  Therefore, they argue, the jury should have been told that the instruction could be used against only the county.  We are not convinced.  But assuming without deciding that the individual appellants are right on this point, we conclude that there was no prejudice, given the overwhelming evidence against them. *See Chess v. Dovey*, 790 F.3d 961, 977 (9th Cir. 2015) (noting that an erroneous jury instruction is harmless if "it is more probable than not that the jury would have reached the same verdict had it been properly instructed" (citation omitted)).

The other challenged instruction told the jury to disregard appellant Alonso's testimony that he heard the prisoners shouting "Spanish words that meant they were ready to fight."  The district court interpreted this testimony to refer to the phrase "puro sur trece," a gang slogan that the court had excluded from evidence in a pretrial order.  The court did not clearly err in finding that appellant Alonso was referring to the excluded slogan in his testimony, and did not abuse its discretion in giving the instruction.

Fourth, appellants argue that the district court should have allowed live testimony from some of the appellees as well as some non-party inmates.  Appellee Rodriguez did provide live testimony.  The other appellees and the non-party inmates testified by means of video depositions.  The district court had authorized the taking of these depositions on the understanding that they could be used at trial in lieu of live testimony, and appellants were able to cross examine the witnesses during the depositions.  Before trial, appellees successfully moved for admission of the videotaped depositions, listing a driving mileage of 126 miles between

the courthouse and the witnesses' place of incarceration. After witness lists were filed, after the final pretrial order was filed limiting witnesses to those identified on the lists, and three weeks after appellees' motion was granted, appellants applied for writs of habeas corpus ad testificandum to compel live testimony from the four appellees and the non-party inmates. The district court reasonably denied the application.

Appellants maintain that the district court erred in denying their application, noting that deposition testimony is allowed under Federal Rule of Civil Procedure 32(a)(4)(B) only if the witness is located more than 100 miles from the place of trial. They contend that the distance between the witnesses' place of incarceration is less than 100 miles "as the crow flies" (though they concede that it is more than 100 miles in driving distance). Appellants never presented this argument to the district court, and it is therefore waived. *See In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).

## I.  Attorney's Fees

The district court awarded $5,378,174.66 in attorney's fees payable to appellees' trial attorneys. We review the award for abuse of discretion, *Jones v. Giles*, 741 F.2d 245, 250 (9th Cir. 1984), and affirm the decision of the district court.

Appellants argue that the district court should have applied the PLRA's attorney's fee provisions to all attorney's fees incurred in this case. The PLRA limits recovery of attorney's fees "in any action brought by a prisoner . . . in which attorney's fees are authorized under [42 U.S.C. § 1988]." 42 U.S.C. § 1997e(d). However, the PLRA's limits

do not apply to attorney's fees incurred in litigation under California Civil Code § 52.1. Attorney's fees incurred in litigating § 52.1 claims are not authorized under 42 U.S.C. § 1988. Rather, § 52.1(h) authorizes attorney's fee awards independently of 42 U.S.C. § 1988. Indeed, we have held that the PLRA attorney's fees cap does not apply even to federal law claims for which attorney's fees *are* available under 42 U.S.C. § 1988, as long as those claims are brought under statutes with their own attorney's fee provisions. *Armstrong v. Davis*, 318 F.3d 965, 973–74 (9th Cir. 2003) (holding that the PLRA cap does not apply to fees awarded under the ADA's or RA's attorney's fee provisions even if the plaintiff could have sought attorney's fees under § 1988).

The district court calculated attorney's fees attributable solely to the work performed in litigating appellees' 42 U.S.C. § 1983 claims and applied 42 U.S.C. § 1997e(d) to those fees. It calculated attorney's fees solely attributable to appellees' § 52.1 claims as well as fees that were as readily available to appellees' § 52.1 claims as to their § 1983 claims, and applied § 52.1(h) to those fees. The district court did not abuse its discretion in so doing. *See Bouman v. Block*, 940 F.2d 1211, 1230, 1237 (9th Cir. 1991) (holding that the district court did not abuse its discretion in awarding fees under a California statute in excess of those allowed under federal law, where the plaintiff challenged the same discriminatory conduct under state and federal law).

Appellants challenge the district court's decision to apply a 2.0 multiplier to the attorney's fees in this case. Calculation of attorney's fee awards in cases brought under state law is a substantive matter to which state law applies. *See In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 838 (9th Cir. 2001); *Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470,

1478–79 (9th Cir. 1995). In accordance with state law, the district court based its decision on the substantial financial risk that appellees' counsel assumed in investing $3.4 million of attorney time in a contingency case; the difficulty of representing prisoners with the Men's Central Jail's highest security classifications, in an excessive force action against high-ranking jail officials, all the while facing "aggressive opposition" from appellants; and the opportunity costs the years-long litigation in this case required. The court expressly noted that it had considered the burden to California's taxpayers that the fee award would represent, and found that the award was justified given the factors described above and the importance of civil rights suits in protecting the public against abuses at the hands of "large or politically powerful defendants." *Horsford v. Bd. of Trustees of California State Univ.*, 132 Cal. App. 4th 359, 399–401 (2005); *see Serrano v. Priest*, 20 Cal. 3d 25, 49 (1977) ("The experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." (internal quotation marks and citation omitted)). We cannot fault the trial judge's reasoning or results here.

## Conclusion

For all the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**